FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| EFRAIN REYNAGA,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>ROSEBURG FOREST PRODUCTS,<br>*Defendant-Appellee.* | No. 14-35028<br><br>D.C. No.<br>6:11-cv-06282-MC<br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted July 5, 2016
Portland, Oregon

Filed January 26, 2017

Before: Harry Pregerson, Carlos T. Bea,
and John B. Owens, Circuit Judges.

Opinion by Judge Pregerson;
Dissent by Judge Bea

## SUMMARY[*]

### Employment Discrimination

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the defendant employer in an action brought by a millwright under Title VII, 42 U.S.C. § 1981, and Oregon state law.

The panel reversed the district court's grant of summary judgment on the following claims: (1) hostile work environment, including employer liability through negligence; (2) disparate treatment with regard to the breaking of the plaintiff's lock and the termination of his employment; (3) retaliation with regard to the termination of the plaintiff's employment; and (4) corresponding state law claims. The panel affirmed on other claims.

The panel held that, as to the plaintiff's hostile work environment claim, a reasonable trier of fact could conclude that (1) a lead millwright's conduct was sufficiently severe or pervasive to create a hostile work environment, and (2) the employer knew about the lead millwright's conduct and failed to take corrective remedial action.

As to the plaintiff's disparate treatment claim, the panel held that he demonstrated the necessary prima facie case to survive summary judgment based on (1) the employer terminating his employment and (2) breaking into his locker. The panel further held that there was a genuine dispute of fact

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

as to the employer's discriminatory intent regarding those challenged actions.

As to the plaintiff's retaliatory termination claim, the panel held that a reasonable trier of fact could conclude that the employer's proffered reason for terminating the plaintiff was pretextual.

The panel affirmed the district court's grant of summary judgment as to additional allegations of disparate treatment and retaliation.

Dissenting in part, Judge Bea wrote that he concurred in the majority's opinion reversing the district court's summary judgment on the plaintiff's retaliatory termination claim. He dissented in part because the employer took prompt and effective action to rectify the hostile work environment experienced by the plaintiff and terminated him only after he repeatedly refused to work his assigned shifts. Judge Bea wrote that the district court therefore concluded properly that the plaintiff's hostile work environment and disparate treatment claims should fail as a matter of law.

**COUNSEL**

Marianne G. Dugan (argued), Eugene, Oregon, for Plaintiff-Appellant.

Jason Montgomery (argued) and Dan W. Clark, Dole Coalwell Clark Mountainspring & Mornarich P.C., Roseburg, Oregon, for Defendant-Appellee.

**OPINION**

PREGERSON, Circuit Judge:

Appellant Efrain Reynaga and his son Richard Reynaga worked as millwrights for Roseburg Forest Products ("Roseburg"). According to Efrain, he and his son were the only millwrights of Mexican descent at Roseburg. Efrain alleges that during the course of his employment, he was subjected to disparate treatment and a hostile work environment because of his race or national origin.

Efrain developed a contentious relationship with lead millwright, Timothy Branaugh ("Branaugh"), who allegedly harassed Efrain with racially disparaging comments. In October and December 2009, Efrain lodged verbal and written complaints with Roseburg management, alleging racial harassment in the workplace. In response, Roseburg initiated an investigation into Efrain's allegations and ultimately rearranged Branaugh's work schedule so that he would not be on the same shift as Efrain.

On January 9, 2010, Efrain and Richard arrived at work to find Branaugh assigned to the same shift. After notifying

Roseburg that they would not work in a hostile environment, Efrain and Richard immediately left the premises. A few days later, Efrain and Richard showed up to work but refused to complete their shift because Branaugh was also scheduled for work at the same time. A supervisor then suspended Efrain and Richard. On January 18, 2010, Roseburg terminated Efrain and Richard's employment.

Efrain filed suit against Roseburg, alleging hostile work environment, disparate treatment, and retaliation in violation of state and federal civil rights laws. Richard was not a party to the litigation. The district court granted Roseburg's motion for summary judgment on all counts. Efrain timely appealed. We reverse in part and affirm in part the district court's ruling.

## FACTUAL BACKGROUND

Efrain was born in Mexico and moved to the United States several decades ago at age 15. He became a United States citizen in 1981. From 2004 to 2010, Efrain worked as a millwright at Roseburg, where he performed his job well and received positive evaluations. Efrain's son, Richard, worked at Roseburg for about two years. Efrain and Richard were the only Hispanic millwrights at Roseburg.

Efrain claims that during the course of his employment with Roseburg, he was subjected to racially disparaging statements and disparate treatment because of his race. His allegations largely pertain to lead millwright Branaugh, whom Efrain describes as a "physically very large" and "aggressive" "bully" who liked to intimidate people.

Efrain alleges that Branaugh frequently made racially derogatory comments and engaged in other harassing conduct, including: (1) Branaugh referred to black people as "niggers" and Arabs as "rugheads;" (2) in September 2009, after Efrain received hunting tags for the second year in a row, Branaugh said, "I'm a true believe [sic] that we should close the borders to keep motherf\*\*\*ers like you from coming up here and killing our elk. I know one motherf\*\*er [sic] who drew tags back to back;" (3) in September 2009, Branaugh stated, "Minorities are taking over the country;" (4) Branaugh asked, "Efrain, are all Mexican women fat?" (5) Branaugh, aware that Efrain's wife is Native American, referred to Native American women as "nasty fat squaws;" (6) Branaugh belittled Efrain in front of an apprentice, stating that Efrain was "a big boy" with a "little, tiny dick" who "needs all the help he can get;" and (7) on October 14, 2009, while Efrain was rebuilding an accumulator, Branaugh commented, "Boy, you're slow," and remarked to the other millwrights, "Man, he just dinks around."

Efrain also alleges several instances of disparate treatment and retaliation at Roseburg: (1) On November 12, 2008, the police brought drug-sniffing dogs to the Roseburg facility. They broke the lock to Efrain and Richard's shared locker even though Richard was present and offered to open it. The police did not find anything nefarious inside. Roseburg did not break the lock to a white millwright's locker even though a dog alerted to it; (2) after Efrain broke his leg on the job, he was required to work and go up and down the stairs while others with similar injuries were allowed to stay home; (3) Branaugh and four other millwrights composed one crew while Efrain and Richard alone composed a second crew, but both crews received the same amount of work; (4) Efrain and Richard were frequently assigned the harder, dirtier, and more

dangerous jobs, such as cleaning the hydraulic room; (5) Efrain had to file written reports on repairs when other millwrights did not have to, and he was harassed about the length of time he took to perform repairs while others were not similarly harassed; (6) Roseburg denied Efrain a company email account, but gave them to other mill workers; (7) after Efrain filed a written complaint about the hostile work environment, work orders were no longer made available to Efrain and Richard, so they had to consult the work board to figure out what job to do; and (8) after Efrain filed a written complaint, Roseburg put 16 millwrights back to full-time work (from part-time), but did not do so for Efrain and Richard.

In October 2009, the alleged hostile work environment worsened. On October 14, 2009, after Branaugh questioned Efrain's work ethic, they engaged in a verbal confrontation over who needed to work on a particular piece of machinery. The next day, Richard spoke with Terry Turner, Roseburg's maintenance superintendent, about Branaugh's harassing behavior. A few days later, Richard and Branaugh engaged in an altercation related to seniority and performance of a particular welding job. Roseburg investigated this altercation. Efrain cooperated in the investigation and complained to management about Branaugh. The next day, Roseburg's managing personnel met with Branaugh to discuss Efrain and Richard's complaints. They told Branaugh that he "can make people uncomfortable" and they "coached Branaugh on his leadership skills."

On December 3, 2009, Efrain filed a written complaint with Roseburg, alleging harassment and discrimination by Branaugh. In response to the complaint, Roseburg hired Vigilant, a company that specializes in employment relations,

to investigate the allegations. On December 10, 2009, Vigilant interviewed Efrain. Efrain stated that Branaugh had made racist statements, had been harassing Efrain for "a long time," and that Efrain did not want to work with Branaugh. Subsequently, Roseburg rearranged Branaugh's schedule so that he would not be on the same shift as Efrain.

On December 21, 2009, Vigilant contacted Efrain to conduct a follow-up interview. Efrain stated that he would only participate if he had an attorney present, but Roseburg's policy did not allow attorneys to be involved with plant-level investigations. Efrain claims that he subsequently informed Roseburg that he was willing to be interviewed a second time without an attorney, but Roseburg never followed up.

On January 4, 2010, Branaugh left in the break room a printed email containing an article that claimed President Obama was an illegal alien and that "our borders are like sieves." When Efrain read it, he was "very concerned about the racial hostility and harassment at work." A few days later, on January 9, 2010, Efrain and Richard arrived at work for their shift, and upon discovering that Branaugh was also on site, they immediately left the premises. Richard notified Roseburg via email about Branaugh's presence on the same shift and stated, "We will not work in a hostile work environment. We will report to our shift on Wednesday, Jan[.], 13, 2010 . . . [u]nless we hear otherwise."

On January 13, 2010, Efrain and Richard showed up to work and were asked to meet with Dan Johnson, Roseburg's Human Resources and Safety Supervisor, to discuss their walking off the job on January 9. Johnson told Efrain and Richard that "Branaugh would be off-shift . . . as much as possible, but that there were some days where Branaugh and

the Reynagas would be on the plant site at the same time." Johnson said that Branaugh had been instructed to stay away from Efrain and Richard, and to have "no contact with them unless a work necessity or emergency arose." Johnson directed Efrain and Richard to do the same and asked if they would complete their shift that day with Branaugh on the premises. Efrain and Richard responded that they would not work with Branaugh, so Johnson suspended them "pending the conclusion of the investigation." That same day, Branaugh revved his engine at Efrain and Richard as they were waiting in the parking lot for their shift to begin.

On January 18, 2010, Efrain received a letter explaining that his employment was terminated "for walking off the job on January 9, 2010, and refusing to work on January 13, 2010." On the same date, Efrain received a second letter explaining that he exhibited a lack of "full cooperation" with the investigation and that Roseburg was "forced to conclude [its] investigation absent a follow up and closing interview[.]" The letter also stated that the investigation revealed "no evidence of a severe or pervasive hostile work environment," but did reveal some "personnel issues and [Roseburg] intend[ed] to address those issues . . . but [Efrain was] unwilling to meet . . . despite . . . repeated phone calls and attempts to communicate."

## PROCEDURAL BACKGROUND

On July 31, 2012, Efrain filed a First Amended Complaint that alleged three causes of action for discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"): (1) hostile work environment; (2) disparate treatment; and (3) retaliation. Efrain also alleged a fourth cause of action for relief under

Oregon state law for disparate treatment (O.R.S. § 659A.030(1)(a)) and hostile work environment (O.R.S. § 659A.030(1)(b)).[1]

Roseburg moved for summary judgment. The district court granted summary judgment in favor of Roseburg on all claims. Efrain timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291, and we review de novo the district court's grant of summary judgment. *See Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1033 (9th Cir. 2005). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine disputes of material fact and whether the district court correctly applied the relevant substantive law." *Id.* An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## DISCUSSION

Efrain contends that the district court erred in granting summary judgment because there are genuine disputes of material fact for each of his claims. As to Efrain's hostile work environment claim, we hold that a reasonable trier of fact could conclude that (1) Branaugh's conduct was sufficiently severe or pervasive to create a hostile work

---

[1] Efrain did not allege a state law claim for retaliation under O.R.S. 659A.030(1)(f).

environment, and (2) Roseburg knew about Branaugh's misconduct and failed to take effective remedial action. As to Efrain's disparate treatment claim, we hold that Efrain has demonstrated the necessary prima facie case to survive summary judgment based on (1) Roseburg terminating Efrain's employment and (2) breaking into Efrain's locker. We further hold that there is a genuine dispute of fact as to Roseburg's discriminatory intent regarding those challenged actions. Finally, as to Efrain's retaliatory termination claim, we hold that a reasonable trier of fact could conclude that Roseburg's proffered reason for terminating Efrain was pretextual.

Accordingly, we reverse and remand for a trial on Efrain's claims of hostile work environment, disparate treatment, and retaliation. We affirm the district court's grant of summary judgment on certain other issues discussed below.

## I. Hostile Work Environment

Efrain first argues that the district court erred in granting summary judgment to Roseburg on his hostile work environment claim. This "First Claim for Relief" is divided into two counts under Title VII and 42 U.S.C. § 1981. We have recognized that the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003). Accordingly, any discussion herein regarding Efrain's Title VII claims also applies to his corresponding § 1981 claims.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to discriminate against an

individual with respect to the compensation, terms, conditions, or privileges of employment because of the individual's race. 42 U.S.C. 2000e-2(a)(1). This includes a prohibition against the creation of a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (internal quotation marks and citations omitted); *Woods v. Graphic Comm'ns*, 925 F.2d 1195, 1200 (9th Cir. 1991) ("Courts have long recognized that a workplace in which racial hostility is pervasive constitutes a form of discrimination.").

### A.  Severe or Pervasive Hostile Work Environment

To succeed on a hostile work environment claim based on race, the plaintiff must demonstrate: "(1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). It is undisputed that Efrain has met his burden on the first two elements. Therefore, to survive summary judgment, Efrain must show the existence of a genuine factual dispute as to (1) whether the workplace conditions were "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment" and (2) whether Roseburg, once apprised of Branaugh's behavior, failed to take adequate remedial and disciplinary action, such that Roseburg may be liable

vicariously or through negligence. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1462–63 (9th Cir. 1994).

In assessing whether a work environment is sufficiently hostile, the court examines the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris*, 510 U.S. at 23). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (internal quotation marks and citation omitted).

"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to create an actionable claim under Title VII, but the harassment need not be so severe as to cause diagnosed psychological injury. *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted); *see also Harris*, 510 U.S. at 22. It is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position." *Steiner*, 25 F.3d at 1463. We have held that such hostility need not be directly targeted at the plaintiff to be relevant to his or her hostile work environment claim. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004).

The plaintiff must show that the work environment was both subjectively and objectively hostile. *Nichols*, 256 F.3d at 871–72. It is undisputed that Efrain perceived his workplace to be hostile, as evidenced by his repeated complaints about Branaugh. As to the objective inquiry, we

assess whether the workplace was hostile from the perspective of a reasonable person belonging to the plaintiff's racial or ethnic group (here, Hispanic/Mexican). *McGinest*, 360 F.3d at 1115.

The district court stated that it was "certainly troubled by [Reynaga's] allegations and recognizes that these events caused [him] to suffer pain." However, the district court concluded that Branaugh's conduct was not severe or pervasive enough to alter the conditions of Efrain's employment. We disagree. Viewing the facts in the light most favorable to Efrain, the incidents described in the record are sufficient to create genuine disputes of material fact as to the severity and pervasiveness of Branaugh's conduct.

Efrain's evidence reveals repeated instances in which Branaugh allegedly made explicit racial and national origin comments in the workplace, including: (1) Branaugh referred to black people as "niggers" and Arabs as "rugheads;" (2) after Efrain received hunting tags for a second year in a row, Branaugh said, "I'm a true believe [sic] that we should close the borders to keep motherf***ers like you from coming up here and killing our elk. I know one motherf**er [sic] who drew tags back to back;" (3) Branaugh stated, "Minorities are taking over the country;" (4) Branaugh asked, "Efrain, are all Mexican women fat?" (5) Branaugh, aware that Efrain's wife is Native American, referred to Native American women as "nasty fat squaws;" and (6) Branaugh left in the break room a printed email containing an article that claimed President Obama was an illegal alien and that "our borders are like sieves."

A reasonable jury could find that Branaugh's alleged conduct would be highly offensive and demeaning to anyone,

especially a person from Mexico. Efrain identifies several derogatory remarks that Branaugh made specifically about Mexicans, including comments about the "border" that were tinged with racism. Branaugh also allegedly used racial slurs, including the word "nigger," which is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." *McGinest*, 360 F.3d at 1116 (citation omitted).

Viewing the evidence favorably to Efrain, Branaugh was not only racially hostile, but also generally derogatory: (1) Branaugh belittled Efrain in front of an apprentice, stating that Efrain was "a big boy" with a "little, tiny dick" who "needs all the help he can get;" (2) while Efrain was rebuilding an accumulator, Branaugh said, "Boy, you're slow" and commented to the other millwrights, "Man, he just dinks around;" and (3) on January 13, 2010, after Roseburg had attempted to separate Branaugh from Efrain and Richard, Branaugh revved his engine at them in the parking lot. These instances, along with the racist comments listed above, reflect a workplace that had been polluted with insult and intimidation.

Contrary to the district court's conclusion, the demeaning comments that directly reference race or national origin were not "offhand comments" or "mere offensive utterance[s]." *Faragher*, 524 U.S. at 788. Efrain's evidence includes repeated examples of unwelcome conduct of a racial nature, and Efrain declared that "[i]n 2009 . . . Branaugh was harassing me regularly," and "Branaugh was always making racist comments at work." Efrain also stated that he felt physically threatened in the workplace: "I was extremely concerned that Branaugh . . . [was] going to physically harm me or my son at work. The work involves dangerous

machinery and requires putting extreme trust in your coworkers." Additionally, Union Shop Steward Scott Albertus testified in deposition that, at the mill, "there was a general attitude that [Branaugh] was allowed to pick on people."

Looking at the evidence in Efrain's favor, as we must on summary judgment, the harassing conduct interfered with Efrain's work performance to the extent that it resulted in confrontations with Branaugh and led Efrain to register verbal and written complaints with management. Additionally, Branaugh's conduct was so extreme that Roseburg had to make sure that Branaugh and Efrain and Richard were not scheduled to work on the same shift. Ultimately, Efrain and Richard felt compelled to leave the workplace because Branaugh was present.

Viewing the evidence in the light most favorable to Efrain, we hold that a reasonable trier of fact could conclude that Branaugh's repeated racially derogatory and humiliating remarks were sufficiently severe or pervasive to create a hostile work environment.

## B. Employer Liability for Hostile Work Environment

An employer may be held liable for creating a hostile work environment either vicariously (i.e., through the acts of a supervisor) or through negligence (i.e., failing to correct or prevent discriminatory conduct by an employee). *McGinest*, 360 F.3d at 1119.

### 1.  Vicarious Liability

An employer is vicariously liable for a hostile work environment created by a supervisor.  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  A supervisor is a person who can take tangible employment actions against an employee, including effecting "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* at 2443 (citation omitted).

At the district court, Efrain conceded that Branaugh was not a supervisor, but argues otherwise on appeal.  As a lead millwright, Branaugh had the authority to direct the work of other millwrights and tell them which tasks to perform that day.  Beyond this, Efrain does not provide any evidence that Branaugh had supervisory authority to effect significant change in the employment status of other employees.  Instead, the record shows that lead millwrights at Roseburg did not have hiring, firing, or disciplinary authority.  Thus, Efrain has not raised a genuine dispute of material fact on this issue, and Roseburg cannot be held liable for Branaugh's conduct under a theory of vicarious liability.

### 2.  Negligence

In the absence of grounds for imposing vicarious liability, an employer is liable for a hostile work environment created by a plaintiff's co-worker if the employer "knew, or should have known, about the harassment and failed to take prompt and effective remedial action."  *E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 1001 (9th Cir. 2010).  Remedial action must include some form of disciplinary measures,

*Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1482 (9th Cir. 1997), which must be "proportionate[] to the seriousness of the offense." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (citation omitted) ("Title VII requires more than a mere request to refrain from discriminatory conduct.").

The record establishes that a reasonable trier of fact could find that Roseburg knew about Branaugh's misconduct and responded inadequately. On October 14, 2009, Efrain had a verbal confrontation with Branaugh, and the next day, Richard spoke with Terry Turner, Roseburg's maintenance supervisor, about Branaugh's harassing conduct. Then, on October 17, 2009, Richard and Branaugh engaged in an altercation related to seniority and performance of a welding job. Efrain cooperated in Roseburg's investigation of that incident and complained to management about Branaugh.

The parties dispute the specific nature of Efrain's complaints, as well as the manner in which Roseburg conducted its investigation into those complaints. For example, Union Shop Steward Scott Albertus testified that Efrain did not make a verbal complaint about a "racial issue." Efrain, on the other hand, testified that he told Albertus and Roseburg management that Branaugh was harassing him in a racist manner.

Additionally, Maintenance Supervisor Terry Turner testified that he, Albertus, and Master Mechanic Dick Westbrook met with Branaugh on October 18, 2009, in response to Efrain's verbal complaint. However, Efrain testified that Albertus admitted to him that he did not attend that meeting. Efrain also claims that Albertus told him Westbrook had indeed "reprimanded" Branaugh, but that

Albertus was skeptical of any real reprimand, remarking, "How do I know – they probably sat together and drank Coca Cola."

Efrain provides further evidence that Roseburg did not respond appropriately to Efrain's verbal complaints. Master Mechanic Westbrook testified at deposition that he "[n]ever g[a]ve [Branaugh] any kind of formal disciplinary action" and that his conversations with Branaugh consisted of platitudes, such as, "I hope you learn from your mistakes. Don't do it again." In fact, the evidence in the record reveals that in response to Efrain's complaint in October 2009, Roseburg's managing personnel simply "coached Branaugh on his leadership skills" and told him he "can make people uncomfortable."

As another point of dispute, Roseburg contends that Efrain interfered with the investigation into his December written complaint by refusing to be interviewed a second time and by walking off the job. Efrain responds that he told Roseburg's human resources representative, Dan Johnson, that he would participate in a second interview without an attorney, but Roseburg never followed up.

These disputes underscore why this case presents questions of material fact and credibility determinations that are appropriate for a jury. Not only was Roseburg's mid-October meeting with Branaugh arguably insufficient to address the seriousness of Efrain and Richard's allegations of discriminatory and harassing behavior, a reasonable trier of fact could also find that it was ineffective. After meeting with management, Branaugh continued to harass Efrain, prompting Efrain to file a written complaint in early December 2009. It was only then that Roseburg hired an

independent company (Vigilant) to investigate the allegations, which eventually led to Roseburg's decision to schedule Branaugh on a separate shift from Efrain.

The record indicates that Roseburg may have acted promptly in investigating Efrain's complaints, but prompt action is not enough. The remedial measures must also be effective. *See Nichols*, 256 F.3d at 875–76 ("When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment.").

There is a genuine dispute of fact as to whether Roseburg's response was effective. After all, Efrain declares that Branaugh continued to harass him even after meeting with management in October. And even though Roseburg contends that it tried to separate Branaugh from Efrain and Richard, the men were still assigned to the same shift on January 9, 2010, and were in close enough proximity for Branaugh to rev his engine at Efrain and Richard on January 13.

Because Efrain has established genuine disputes of fact as to whether Roseburg fostered and failed to remedy a racially hostile work environment, we reverse the district court's grant of summary judgment on Efrain's hostile work environment claim.

## II. Disparate Treatment

In addition to facing liability by creating a hostile work environment, an employer is liable under Title VII and § 1981 when it subjects an employee to disparate treatment.

To show a prima facie case of disparate treatment, a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1110 (9th Cir. 1991) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 250, 253 (1981)). One way to establish an inference of discrimination is by satisfying the prima facie elements from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973): (1) the plaintiff belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802).

Under the *McDonnell Douglas* burden-shifting framework, when the plaintiff demonstrates his prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Hawn*, 615 F.3d at 1155. If the defendant meets this burden, then the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination." *Id.*

However, nothing compels the parties to use the *McDonnell Douglas* framework. *McGinest*, 360 F.3d at 1122. In the alternative, a plaintiff may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason "more likely than not motivated" the employer. *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir.

2007) (citation omitted); *see also Hawn*, 615 F.3d at 1155 (explaining that a plaintiff may show an inference of discrimination "through comparison to similarly situated individuals, or any other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination") (internal quotation marks and citation omitted).  Either way, we require "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry–one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation marks and citation omitted).

Efrain bases his disparate treatment claim on a number of alleged instances of discriminatory employment actions, the foremost being his termination.  Efrain alleges that his employment was terminated because of his race or national origin, and/or because he made complaints about being discriminated against.  The district court determined that even assuming Efrain could make out a prima facie case of disparate treatment based on his termination, he could not establish that Roseburg's articulated, non-discriminatory reason for the termination was pretextual.

We disagree, and hold that Efrain has established the necessary disputes of material fact to survive summary judgment.  Roseburg concedes that Efrain has satisfied the first three elements of the prima facie case, but maintains that Efrain has not shown that similarly situated employees were treated more favorably because there is no evidence that non-Hispanic employees have walked off the job (like Efrain) and not been terminated.

Roseburg is correct that there is no evidence in the record of similarly situated employees being treated more favorably in that precise manner. But there is sufficient evidence to give rise to an inference of discrimination based on two non-Hispanic employees (Branaugh and Mike Martin) being treated more favorably than Efrain. The record indicates that Branaugh was hardly reprimanded (and, significantly, not terminated) after several complaints were made about his hostile behavior, and Martin, a white employee, was not subjected to the same lock-cutting intrusion as Efrain. We therefore hold that Efrain has presented sufficient evidence to satisfy the fourth element of his prima facie case. Because Efrain has demonstrated a prima facie case, the burden shifts to Roseburg to provide a legitimate, non-discriminatory reason for the termination. *See Vasquez*, 349 F.3d at 641.

Roseburg contends that it terminated Efrain for walking off the job on January 9, 2010, and for refusing to work as scheduled on January 13, 2010. In response, Efrain presents sufficient evidence to establish a genuine dispute of material fact as to whether Roseburg's claimed reasons for termination were pretextual. In January 2010, with full knowledge of Branaugh's behavior, Roseburg required Efrain to work at the same site as Branaugh. Roseburg thereby conditioned Efrain's employment on his willingness to work with a co-worker who had a proven history of repeatedly and persistently harassing Efrain based on his race and national origin. This fact, along with the evidence of Roseburg's failure to ever legitimately reprimand Branaugh, is sufficient to establish a genuine dispute of fact as to Roseburg's discriminatory intent in firing Efrain. Accordingly, the district court erred in granting summary judgment in favor of Roseburg on the discriminatory termination claim.

We also hold that Efrain's disparate treatment claim based on the lock-cutting incident survives summary judgment. Efrain claims that Roseburg's act of breaking into Efrain and Richard's locker during a search of the mill was discriminatory. It is undisputed that on November 12, 2008, Roseburg brought in a narcotics task force with drug sniffing dogs to search certain areas of the mill. During the search, a lock was cut off the locker that Efrain and his son shared.

The parties dispute the remaining circumstances of the search. Union Shop Steward Scott Albertus testified that a drug-sniffing dog approached Efrain's locker, at which point Roseburg ordered the lock cut and the locker searched. Richard testified that he was present during the search and offered to open the locker with a key, but management waved him away and broke the lock. Richard also testified that the dogs alerted to the locker of a white co-worker, Mike Martin. The record does not indicate that Roseburg broke the lock on Martin's locker, and Efrain testified that he heard that Martin's locker was not searched.

Precisely because the events of the search are unclear, we hold that Efrain has raised the necessary disputes of material fact to survive summary judgment. *See Villiarimo*, 281 F.3d at 1062 ("This Court has explained that under the *McDonnell Douglas* framework, '[t]he requisite degree of proof necessary to establish a prima facie case for Title VII discrimination does not even need to rise to the level of a preponderance of the evidence.'") (quoting *Walls v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)); *see also Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) ("As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary

judgment.") (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000)).

Viewing the evidence favorably to Efrain, he is able to satisfy his prima facie case of disparate treatment based on the lock-cutting incident. Efrain has presented sufficient evidence that he belongs to a protected class (he is Hispanic), and that he was performing according to his employer's legitimate expectations (he performed his job well and received positive evaluations). He has also shown that he suffered an adverse employment action; Roseburg's act of breaking into Efrain's locker without notice materially affected the terms, conditions, or privileges of Efrain's employment because it was a "substantial interference with work facilities important to the performance of the job." *Chuang*, 225 F.3d at 1125–26 (holding that the forcible relocation of plaintiff's laboratory space more than qualified as an adverse employment action). Finally, Efrain has presented evidence that a similarly situated employee was treated more favorably than he, as a white co-worker's locker was not broken into after a drug-sniffing dog alerted to it. Our holding that summary judgment is unwarranted is also bolstered by Roseburg's failure to provide a legitimate, non-discriminatory reason why it broke Efrain and Richard's lock rather than just letting Richard open it with a key.

The district court held that Efrain's allegations were insufficient to give rise to an inference of unlawful discrimination because they were "largely unsubstantiated." In refusing to give weight to Efrain and Richard's declarations about the locker room search, the district court erred. "That an affidavit is selfserving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *United States*

*v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). If Efrain and Richard's declarations stated only conclusions, and not "such facts as would be admissible in evidence," then the declarations would not be cognizable. *Id.* (citation omitted). But the declarations do state facts of which Efrain and Richard have personal knowledge and should not be discredited outright. Ultimately, Efrain has presented sufficient evidence to raise a genuine dispute of fact as to discriminatory intent behind the lock-cutting.

As to Efrain's remaining allegations of disparate treatment, the district court correctly held that Efrain did not provide sufficient evidence that those incidents constitute adverse employment actions or that similarly situated employees were treated more favorably. Therefore, the district court did not err in granting summary judgment as to those additional allegations of disparate treatment.

## III.     Retaliation

To establish a prima facie case of retaliation, Efrain must show "that he undertook a protected activity under Title VII, his employer subjected him to an adverse employment action, and there is a causal link between those two events." *Vasquez*, 349 F.3d at 646. "[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

Similar to the disparate treatment context, if Efrain establishes a prima facie case, the burden then shifts to Roseburg to advance a legitimate, nonretaliatory reason for any adverse employment action taken against Efrain. *Steiner*,

25 F.3d at 1464–65. If Roseburg meets this burden, then Efrain "has the ultimate burden of showing that [Roseburg's] proffered reasons are pretextual." *Id.* at 1465.

Efrain alleges that Roseburg retaliated against him for complaining about Branaugh orally in October 2009 and by written complaint in December 2009. As the district court correctly held, Efrain's complaints about Branaugh are protected activity under Title VII. *See Brooks*, 229 F.3d at 928 (explaining that "[a]sserting one's civil rights" is a protected activity). Therefore, Efrain has satisfied the first element of the prima facie case.

As to the second element of the prima facie case, Efrain alleges five instances of retaliatory adverse employment action: (1) In November 2009, Efrain and Richard were required to work at the powerhouse while five white millwrights worked a better job; (2) on December 30, 2009, Roseburg converted 16 millwrights from part-time to full-time but did not do so for Efrain and Richard; (3) in January 2010, work orders were no longer made available to Efrain and Richard, so they had to consult the work board to figure out what job to do; (4) Branaugh and four other millwrights, who composed one crew, received an equivalent level of work as Efrain and Richard, who alone composed a second crew; and (5) on January 18, 2010, Efrain was terminated.

The district court correctly held that Efrain's first four alleged instances of retaliation do not satisfy his prima facie burden because the alleged actions are either too trivial or Efrain has not established the necessary causal link between the alleged actions and his complaints. The district court also correctly held, however, that as to the retaliatory termination claim, Efrain has met his prima facie burden. Because Efrain

has met his prima facie burden for the retaliatory termination claim, the burden shifts to Roseburg to provide "legitimate, nonretaliatory reasons" for the termination. *Steiner*, 25 F.3d at 1464–65. If Roseburg is able to do so, then Efrain must show that Roseburg's proffered reasons are pretextual. *Id.* at 1465.

The district court noted that Roseburg offered two non-retaliatory reasons for the termination—Efrain walked off the job on January 9, 2010, and refused to work as scheduled on January 13, 2010. The district court held that Efrain failed to show that those reasons were pretextual. We disagree, and hold that Efrain has established a genuine dispute of material fact as to pretext.

In *McDonnell Douglas*, the Supreme Court explained that evidence of pretext can take many forms. 411 U.S. at 804–05. For example, the manner in which the plaintiff was treated by his employer during his employment may be relevant to a showing of pretext. *Id.* Additionally, the fact that persons outside the plaintiff's protected class were treated better for offenses of comparable seriousness could also help demonstrate pretext. *Id.* at 805. The Court also explained in *Reeves v. Sanderson Plumbing Prods., Inc.* that whether summary judgment is appropriate depends on a number of factors, including the strength of the plaintiff's prima facie case and "the probative value of the proof that the employer's explanation is false." 530 U.S. 133, 148–49 (2000).

Here, the district court erred by focusing on "Plaintiff's unspecified reliance on prior allegations of disparate treatment." Efrain did more than rely on unspecified allegations to demonstrate a genuine dispute of fact as to

pretext.   For one, Efrain's prima facie case is strong, particularly in light of the timing of the termination.  Efrain had worked at Roseburg for more than five years, yet he was fired barely one month after making a formal written complaint.  Proof of a causal link between Efrain's complaint and his termination—as evidenced by temporal proximity—is certainly relevant to an evaluation of pretext.  *See Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) ("In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext.").

Second, Efrain also presents evidence that he was treated less favorably than other employees outside of the protected class.   For example, the record indicates that Branaugh subjected Efrain to a hostile work environment, yet Branaugh, a white man, was not seriously punished.   In contrast to Roseburg's benign treatment of Branaugh, Efrain was terminated for missing just one and a half day's work. Notably, those were days that Efrain refused to work specifically because Branaugh was on the same shift.

Efrain's evidence as to how he was treated during his employment, the timing of his termination being one month after his written complaint, and the disparity in punishment between Efrain and Branaugh are sufficient to establish a genuine dispute of fact as to whether Roseburg's proffered reason for terminating Efrain's employment was pretextual. Therefore, the district court erred in granting summary judgment in favor of Roseburg on Efrain's claim of retaliatory termination.

## IV.      State Law Claims

This court has held that the substantive analysis for Title VII and § 1981 claims also applies to discrimination claims under O.R.S. §§ 659A.030(1)(a), (b). *Dawson*, 630 F.3d at 934–35. Therefore, pursuant to the analysis in Parts I and II, *supra*, the district court erred in granting Roseburg's motion for summary judgment on Efrain's state law claims.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of Roseburg's motion for summary judgment and **REMAND** for further proceedings on the following claims: (1) hostile work environment, including employer liability through negligence; (2) disparate treatment with regard to the breaking of Efrain's lock and the termination of Efrain's employment; (3) retaliation with regard to Roseburg's termination of Efrain's employment; and (4) state law claims for hostile work environment and disparate treatment as consistent with the analysis in the federal context.   We **AFFIRM** the district court's grant of Roseburg's motion for summary judgment on the remaining issues, as discussed above.   Costs shall be taxed against Roseburg.

BEA, Circuit Judge, dissenting in part:

Efrain Reynaga appeals the district court's grant of summary judgment in favor of defendant Roseburg Forest Products ("Roseburg") for his hostile work environment, disparate treatment, and retaliation claims in violation of 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 1981, and Oregon state law. The events leading to this lawsuit occurred when Appellant Reynaga (of Mexican dissent) worked as a millwright for Roseburg between 2004 and 2010, during which time he claims to have been subject to racially disparaging statements and disparate treatment because of his race by lead millwright Timothy Branaugh. I concur in the panel majority's opinion reversing the district court's grant of summary judgment for defendant on Reynaga's retaliatory termination claim. However, because Roseburg took prompt and effective action to rectify the hostile work environment experienced by Reynaga and terminated Reynaga only after he repeatedly refused to work his assigned shifts, the district court concluded properly that his hostile work environment and disparate treatment claims should fail as a matter of law.

I.

Reynaga has the burden of proving that Branaugh's conduct was "sufficiently severe or pervasive to alter the conditions of…[his] employment and create an abusive work environment." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). Furthermore, Reynaga must establish that Roseburg is liable for Branaugh's conduct, either vicariously or based on negligence. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 (9th Cir. 2004).

The district court concluded that Branaugh's racist statements were not sufficiently severe so as to alter the conditions of Reynaga's employment. The court also held, alternatively, that (1) Roseburg was not vicariously liable for Branaugh's conduct because Branaugh was not a supervisor, and that (2) Roseburg was not negligent because it promptly and effectively remedied Branaugh's misconduct. I agree with the panel majority that Roseburg cannot be held liable for Branaugh's conduct under a theory of vicarious liability. But even assuming that Branaugh's misconduct was sufficiently severe so as to alter the terms of Reynaga's employment, Reynaga has not established that Roseburg failed promptly and effectively to remedy Branaugh's misconduct.

Roseburg took prompt action to remedy the alleged misconduct. Reynaga's son spoke with another Roseburg employee about Branaugh's behavior in October 2009, which led Roseburg to conduct an investigation in which Reynaga participated. But Appellant filed a written complaint with Roseburg that specifically identified Branaugh and referred to "acts of discrimination" and a "hostile work environment" only in December 2009. Roseburg hired Vigilant within one week of receiving Reynaga's written complaint, and a representative from Vigilant interviewed Reynaga on December 10, 2009. Vigilant interviewed other employees as well. During the course of Vigilant's investigation, Roseburg altered Branaugh's work schedule to keep Reynaga and Branaugh apart as much as possible.

Roseburg's intervention was not only prompt, but also effective. Reynaga does not identify a single derogatory statement made by Branaugh after Vigilant commenced its

investigation.[1]  The fact that Roseburg scheduled Reynaga to be at the facility on the same day as Branaugh alone would not allow a reasonable juror to conclude that Roseburg's intervention was not effective, such that Roseburg could be held liable as negligent. Roseburg's duty was to take reasonable care in eliminating Reynaga's exposure to Branaugh's hostile, racist statements, not ensure that Branaugh and Reynaga were never working in the same facility.   Thus, as far as Reynaga's evidence shows, Branaugh's racist statements ceased by the time that the employer acted on Reynaga's complaint.   Reynaga cannot raise a triable issue of fact as to whether his workplace was hostile following Roseburg's intervention.    As such, Reynaga's hostile workplace claim should fail.

## II.

To establish that he suffered disparate treatment in violation of Title VII and § 1981, Reynaga "may…[use] the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the defendant. *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007). Under the *McDonnell Douglas* framework, Reynaga must show that: "(1) [he] belongs to a protected class, (2) [he] was performing according to [his] employer's legitimate expectations, (3) [he] suffered an adverse employment action,

---

[1] Reynaga identified only two acts by Branaugh occurring after December 10, 2009: (1) on Jan. 4, 2010, Branaugh left an email in the breakroom purporting to quote a book by Lee Iacocca that said "our borders are like sieves;" and (2) on Jan. 13, 2010, Branaugh revved his automobile's engine in Reynaga's presence. These two acts are not sufficiently severe so as to alter the terms of Reynaga's employment. *Vasquez*, 349 F.3d at 642.

and (4) other employees with qualifications similar to [his] own were treated more favorably." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

According to Roseburg, it fired Reynaga on January 18, 2010 because Reynaga walked off the job on January 9 and refused to work his scheduled shift on January 13. It is undisputed that Reynaga walked off the job on January 9 and refused to work the January 13 shift. These are legitimate, non-discriminatory reasons to terminate Reynaga. The panel majority asserts that Roseburg requiring Reynaga to work on January 13 at the same time as Branaugh and Roseburg's decision not to discipline Branaugh immediately offered potential evidence of disparate treatment. However, as mentioned above, Reynaga did not have a right to insist that Roseburg fire Branaugh or never schedule Branaugh at the same time that Reynaga was working. Branaugh's hostile, racist statements ceased after Vigilant began investigating Branaugh in December 2009. That Roseburg did not discipline Branaugh before Vigilant completed its investigation and Reynaga walked off the job similarly cannot be construed as evidence of disparate treatment. For these reasons, Reynaga did not provide direct or circumstantial evidence to suggest a discriminatory motivation for termination. He also failed to offer evidence that other workers had not been terminated when they walked off the job so as to satisfy the burden shifting framework. Accordingly, no reasonable jury could find that Roseburg subjected Reynaga to racially disparate treatment when it

fired him for refusing to work on January 13. The district court should thus be affirmed on this point.[2]

   I respectfully dissent.

---

   [2] I agree with the panel majority that Reynaga did raise a triable issue of material fact as to disparate treatment for the lock cutting incident under the *McDonnell-Douglas* framework.