**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CYNTHIA FULLER,
            *Plaintiff-Appellant*,

                    v.

IDAHO DEPARTMENT OF
CORRECTIONS; BRENT REINKE;
HENRY ATENCIO,
            *Defendants-Appellees.*

No. 14-36110

D.C. No.
1:13-cv-00035-
JLQ

OPINION

Appeal from the United States District Court
for the District of Idaho
Justin L. Quackenbush, District Judge, Presiding

Argued and Submitted March 6, 2017
Seattle, Washington

Filed July 31, 2017

Before: Susan P. Graber, Sandra S. Ikuta,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz;
Dissent by Judge Ikuta

## SUMMARY[*]

### Employment Discrimination

The panel vacated the district court's grant of summary judgment in favor of the defendant on a Title VII hostile work environment claim brought by a plaintiff who was raped by an Idaho Department of Corrections co-worker.

The panel held that the plaintiff proffered sufficient admissible evidence to avoid summary judgment. Viewing the facts in the light most favorable to the plaintiff, the panel held that she had raised triable issues of fact as to whether the IDOC's actions following the rape were sufficiently severe or pervasive to create a hostile work environment. The panel held that if a jury found that the plaintiffs' IDOC supervisors created a hostile work environment, then the IDOC would be vicariously liable.

In a concurrently filed memorandum disposition, the panel affirmed the district court's summary judgment to the IDOC on other claims. It remanded for a trial on the hostile work environment claim.

Dissenting, Judge Ikuta wrote that the evidence in the record did not show discrimination because of the plaintiff's sex, as is required to establish an employer's liability under Title VII.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kathryn K. Harstad (argued) and Erika Birch, Strindberg & Scholnick LLC, Boise, Idaho, for Plaintiff-Appellant.

Phillip J. Collaer (argued) and Tracy J. Crane, Anderson Julian & Hull LLP, Boise, Idaho, for Defendants-Appellees.

**OPINION**

HURWITZ, Circuit Judge:

Cynthia Fuller was raped by an Idaho Department of Corrections ("IDOC") co-worker.  Before that sexual assault, the IDOC had placed the co-worker, whose conduct had been the subject of several complaints by female employees, on administrative leave because he was under criminal investigation for another rape.  Shortly before Fuller was raped, a supervisor told employees (including Fuller) that the agency "looked forward" to the co-worker's prompt return from leave.  One day after Fuller reported the rape, a supervisor told her that the rapist "had a history of this kind of behavior."  Nonetheless, the supervisor sent an e-mail to all agency employees the very next day, telling them to "feel free" to contact the rapist and "give him some encouragement."  When Fuller asked for paid administrative leave to deal with problems caused by the rape, she was told that her case was not "unusual" enough to warrant that treatment; the rapist, however, was provided paid leave.

The district court granted summary judgment to the IDOC on Fuller's hostile work environment claim.  We hold that Fuller proffered sufficient admissible evidence to avoid

summary judgment, and we remand for a trial on her hostile work environment claim.[1]

## FACTUAL BACKGROUND[2]

### A. Rape Allegations and Cruz Investigation.

In January 2011, Cynthia Fuller began working as a probation and parole officer in the IDOC District 3 office in Caldwell, Idaho. During her first week on the job, Fuller met Herbt Cruz, a senior probation officer. Months later, they began an intimate relationship. Although IDOC policy required reporting the relationship, they kept it secret.

In late July 2011, Idaho State Police notified the IDOC that the Canyon County Sheriff's Office was investigating Cruz for the rape of "J.W.," a civilian. On August 15, the IDOC placed Cruz on administrative leave with pay. District Manager Kim Harvey called a District 3 staff meeting, advising the employees that Cruz was on administrative leave because of a confidential, ongoing investigation and "was not authorized to be on the premises." But, Harvey also stated that the IDOC looked forward to Cruz's prompt return to work.

The next day, Fuller disclosed her relationship with Cruz to her supervisors, who did not reveal the nature of the ongoing investigation to her. Eventually, Fuller learned that

---

[1] We have affirmed the district court's summary judgment to the IDOC on Fuller's other claims in a memorandum disposition issued today.

[2] We view the evidence in the light most favorable to Fuller, the party opposing summary judgment. *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016).

Cruz had been accused of rape, but nonetheless continued her relationship with him.

On August 22, Cruz raped Fuller at his home. A second rape took place on August 30 or 31, and a third on September 3, both also outside the workplace.

On September 6, after the IDOC received photos of her injuries, Fuller confirmed to Harvey that Cruz had raped her. Harvey took Fuller to the Canyon County Sheriff's Office and sat in on part of her interview with detectives. Afterwards, Harvey told Fuller "that Cruz had a history of this kind of behavior and that he knew of several instances."[3] The next day, Fuller obtained a civil protection order prohibiting Cruz from coming within 1000 feet of her.

Henry Atencio, Deputy Chief of the IDOC Probation & Parole Division, directed Harvey to maintain contact with Cruz while he was on leave, to keep him informed of the investigation's status and "make sure he's doing okay in terms of still being our employee." Fuller knew about Cruz's continued contacts with supervisors while on leave. On September 7, the day Fuller obtained the civil protection order, Harvey sent this e-mail to District 3 staff, including Fuller:

---

[3] Prior to the rape of Fuller, the IDOC had received complaints from three female employees about inappropriate behavior by Cruz. One of the employees filed a suit against the IDOC in 2006, alleging sexual harassment by Cruz. Cruz was not disciplined in connection with any of these events, although in 2010, the IDOC decided not to transfer him to a district office in which two of the complainants worked, after they objected. Harvey then was asked by Henry Atencio, his supervisor, to tell Cruz that "that behavior won't be tolerated," and to "keep an eye on him."

> Just an update on Cruz. I talked to him. He sounds rather down, as to be expected. . . . Just as a reminder – and this is always one thing I hate about these things – he cannot come to the office until the investigation is complete. Nor can he talk to anyone in the Department about the investigation. So, if you want to talk to him, give him some encouragement etc., please feel free. Just don't talk about the investigation. At this point, I honestly don't know the status of it.

The IDOC began an internal investigation of Cruz on September 12, and on September 14 expanded the investigation to include Fuller's allegations. IDOC investigators met with Cruz twice in September, and also interviewed Fuller. The investigation concluded in late October, with the IDOC deciding to terminate Cruz's employment. But, waiting to see if Cruz would be criminally charged, the IDOC did not issue a Notice of Contemplated Action until December 27, nor did it apprise Fuller whether Cruz had been cleared. Cruz promptly resigned after being notified that the IDOC intended to terminate his employment.

## B. The IDOC's Responses to Fuller's Report.

After Fuller reported the rapes to the Canyon County Sheriff's Office, Harvey told Atencio and Fuller's direct supervisors about the allegations. He told the supervisors that she was taking leave and that, if other employees inquired about her absence, the agency should say that it was related to her known illness. Harvey told Fuller that he would determine whether she was eligible for paid administrative leave. On September 19, Atencio formally

denied Fuller's leave request in an e-mail, explaining that only employees under investigation are eligible for administrative leave, and advising her to use accrued vacation and sick time instead. He copied Roberta Hartz, a Human Resources ("HR") representative, on the e-mail, despite knowing she had previously lived with Cruz.

IDOC Standard Operating Procedure ("SOP") 206 permitted the Director to grant paid administrative leave "[w]hen a manager (or designee) deems it necessary due to an unusual situation, emergency, or critical incident that could jeopardize IDOC operations, the safety of others, or could create a liability situation for the IDOC."[4] But, IDOC Director Brent Reinke granted paid leave under this policy only for "acts of God, nature," because state officials had instructed him to restrict paid leave.

Fuller later received intermittent Family & Medical Leave Act leave. After her doctor certified that she was "unable to concentrate, and perform," had "severe anxiety," and was "unsafe to carry [a] weapon," the IDOC placed Fuller on modified duty doing data entry.

Fuller again requested paid leave, noting that (1) Cruz was being paid during his administrative leave; (2) she had "received no guidance from the IDOC regarding any assistance . . . as a victim, including" filing a sexual harassment claim; and (3) the IDOC had put other "potential victim[s]" at risk by failing to disclose to staff why Cruz was

---

**[4]** SOP 206 also permits the director to grant paid administrative leave "[w]hen the employee is being investigated" and "[w]hen the employee is in the due process procedure of a disciplinary action." Cruz received paid leave under these provisions.

on leave and by stating that it "hopes he returns soon." The IDOC did not respond to her letter.

Fuller met with Atencio, Harvey, and Hartz[5] on November 10, 2011, asking for reinstatement of her vacation and sick time and for paid administrative leave for the work she missed, and would continue to miss, because of the rapes. Atencio said she did not meet the SOP 206 criteria, because her situation was not "unusual."

Fuller also described her "uncomfortable work environment" to the supervisors. Staff, unaware of why she had been absent from work, suspected that she was "faking being sick." This ostracization occurred, she believed, "because [the staff have] been misled" about Cruz's situation. Harvey explained that he was "not at liberty to say why [Cruz is on leave] because . . . that wouldn't be fair. . . if the allegations were proven untrue," and Cruz would have a "stigma hanging over [him]." Harvey said that at the time he told staff that he looked forward to Cruz's prompt return to work, "the only alleged victim that [he] knew about was the gal . . . that had originally come forward," not Fuller. Fuller said Harvey's later encouragement of staff to give Cruz "moral support," despite knowing that she had accused him of rape, was "completely insulting." Harvey replied that he was "trying to keep [her] out of it."

Fuller asked that the IDOC inform District 3 employees of the civil protection order, explaining that she did not "feel safe" because Cruz could walk in to the building and no one

---

[5] Fuller was uncomfortable with Hartz's presence at the meeting because of Hartz's previous relationship with Cruz, and Hartz's failure to discipline another IDOC employee whom Fuller had previously accused of inappropriately touching her.

would call the police. Atencio responded that, "as much as you find this distasteful, Cruz is still our employee. And we have to be conscious of his rights."

On November 16, Harvey sent this message to District 3 staff:

> I want to update you regarding Herbt Cruz. As you know, Herbt is on leave pending an investigation. The investigation is on-going and we hope to bring this to a resolution as soon as possible. As the investigation is currently underway, Cruz is not allowed in the D-3 offices. If you see him, please contact a supervisor.

Fuller resigned that day.

## PROCEDURAL BACKGROUND

After exhausting administrative remedies, Fuller sued the IDOC, Reinke, and Atencio in the District of Idaho. After the district court granted a defense motion for partial summary judgment, four claims remained: (1) a Title VII hostile work environment claim against the IDOC; (2) a Title VII gender discrimination claim against the IDOC; (3) a 42 U.S.C. § 1983 claim alleging equal protection violations against Reinke and Atencio; and (4) an intentional or negligent infliction of emotional distress claim against Atencio.

The parties filed cross-motions for summary judgment on these four claims. The district court granted the defendants' motion. The court rejected Fuller's hostile work environment claim on the grounds that the rapes occurred

outside the workplace and that the IDOC had taken remedial action.  Fuller timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's grant of summary judgment de novo.  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).  "[W]e must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law."  *Id.* (quoting *Ray v. Henderson*, 217 F.3d 1234, 1239–40 (9th Cir. 2000)); *see also* Fed. R. Civ. P. 56(a).

We recently explained in a case involving a hostile work environment claim that "what is required to defeat summary judgment is simply evidence such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor."  *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation marks omitted).  In assessing whether a genuine issue of material fact exists for trial, we do not weigh the evidence, nor make factual or credibility determinations.  *Id.*  "[W]here evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment."  *Id.* (internal quotation marks omitted).  And, "where application of incorrect legal standards may have influenced the district court's conclusion, remand is appropriate."  *Id.* at 442.

## DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employer discrimination on the basis of sex regarding "compensation, terms, conditions, or privileges of

employment."   42 U.S.C. § 2000e-2(a)(1).   The statutory prohibition extends to the creation of a hostile work environment that "is sufficiently severe or pervasive to alter the conditions of the victim's employment."   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).   To prevail on a hostile work environment claim, an employee must show that her employer is liable for the conduct that created the environment.   *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

### A.  Hostile work environment.

A hostile work environment occurs when an employee 1) "was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"   *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (quoting *Ellison v. Brady*, 924 F.2d 872, 875–76 (9th Cir. 1991)).   "The working environment must both subjectively and objectively be perceived as abusive," and the objective analysis is done "from the perspective of a reasonable" woman.   *Id.*

In determining whether a work environment is sufficiently hostile, the court evaluates the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   *Little*, 301 F.3d at 966 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (per curiam)).   While "'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to create an actionable claim under Title VII . . .

the harassment need not be so severe as to cause diagnosed psychological injury." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017) (alteration omitted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "It is enough 'if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position.'" *Id.* (quoting *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994)).

Fuller argues that the IDOC's reactions to the rapes—effectively punishing her for taking time off, while both vocally and financially supporting her rapist—created a hostile work environment. The issue is whether an objective, reasonable woman would find "her work environment had been altered" because the employer "condoned" the rape "and its effects." *Little*, 301 F.3d at 967–68.[6] Viewing the facts in the light most favorable to Fuller, we hold that Fuller has raised triable issues of fact as to the existence of a hostile work environment.[7]

When Fuller reported her rapes, Harvey told her "that Cruz had a history of this kind of behavior" and "he knew of several instances" of misconduct by Cruz. But, nonetheless, Harvey almost immediately thereafter told District 3 staff to "feel free" to "give [Cruz] some encouragement" and that he "hate[d]" that Cruz "cannot come to the office until the

---

[6] It is undisputed that Fuller subjectively perceived her work environment as hostile.

[7] Fuller also alleged that the rapes created a hostile work environment. We affirm the district court's grant of summary judgment to the defendants as to that claim in the memorandum disposition filed today.

investigation is complete." This e-mail came on the heels of Harvey's previous statement to staff that he looked forward to Cruz returning quickly. Fuller was privy to both of those announcements, in which her supervisor publicly supported an employee whom he knew was accused of raping two women and sexually harassing several others.[8]

Fuller was aware that IDOC supervisors were communicating with Cruz, offering him support during his suspension. And, although Fuller was interviewed by IDOC investigators in September, and the agency had concluded by late October that he should be terminated, no disciplinary action was taken until after Fuller resigned. As far as Fuller knew, Cruz might return to work any day.

When Fuller raised concerns about her safety should Cruz return to the workplace, Harvey and Atencio emphasized that Cruz was "still our employee," and that they did not want a "stigma hanging over" him in the event "the allegations were proven untrue." Therefore, she reasonably could have suspected that the IDOC had exonerated Cruz, and that he would soon return to work.

In light of the severity of the sexual assaults on Fuller, documented by the photographs seen by the IDOC supervisors, a reasonable juror could find that the agency's

---

[8] The IDOC's knowledge of previous sexual harassment complaints against Cruz, "while alone insufficient to create a hostile work environment, "is relevant and probative of [the IDOC's] general attitude of disrespect toward [its] female employees." *Zetwick*, 850 F.3d at 445 (quoting *Heyne v. Caruso*, 69 F.3d 1475, 1479–81 (9th Cir. 1995)). Because Fuller learned after she was raped that the IDOC was aware of Cruz's "history of this kind of behavior," she reasonably could have believed that the IDOC would continue to support Cruz at the expense of its female employees.

public and internal endorsements of Cruz "ma[de] it more difficult for [Fuller] to do her job, to take pride in her work, and to desire to stay in her position." *Reynaga*, 847 F.3d at 687 (quoting *Steiner*, 25 F.3d at 1463). A reasonable woman in Fuller's circumstances could perceive the repeated statements of concern for Cruz's well-being by supervisors as evincing their belief that Fuller was lying or, perhaps worse, as valuing Cruz's reputation and job over her safety. This conclusion is reinforced by the fact that Harvey and Atencio held important supervisory positions. *See Zetwick*, 850 F.3d at 445 (emphasizing "the potentially greater impact of harassment from a supervisor").

The repeated endorsements of Cruz were not "simple teasing, offhand comments, and isolated incidents," or ordinary workplace interactions. *Faragher*, 524 U.S. at 788 (citation and internal quotation marks omitted). The decision to publicly support an employee accused of raping another employee was "humiliating" and potentially "physically threatening" to Fuller, not "a mere offensive utterance." *Id.* at 787–88. A reasonable juror could credit Fuller's statements that Harvey's e-mail was "completely insulting" to her, and that she felt the IDOC had given no "assistance for [her] as a victim" of a rape which "impaired [her] ability to live normal, sleep normal, or feel safe." These facts raise a genuine dispute as to whether the work environment was "sufficiently hostile" to violate Title VII. *Little*, 301 F.3d at 966.

Other evidence, while perhaps not sufficient by itself to support Fuller's Title VII claim, supports the conclusion that a reasonable woman could perceive a hostile work

environment at the IDOC.[9]  Atencio denied Fuller's request for paid administrative leave to recover from her rapes in an e-mail in which he copied Hartz, who was not the assigned HR representative, despite knowing that Hartz had a previous romantic relationship with Cruz.  Fuller produced evidence that she was "forced to return to work against" her therapist's and doctor's recommendations, while her rapist was granted paid administrative leave.  Fuller also expressed concern about her co-workers' hostility toward her for missing work, blaming Harvey's e-mail, which failed to divulge why Cruz was on leave.

"While each of these incidents may not in itself be sufficient to support a hostile work environment claim, their cumulative effect is sufficient to raise material issues of fact as to whether the conduct was so severe or pervasive to alter the conditions of the workplace." *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1207 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 623 (2017); *see also Zetwick*, 850 F.3d at 444 (requiring consideration of "*the cumulative effect of the conduct at issue* to determine whether it was sufficiently 'severe or pervasive'").  The defendants do not contest that these actions occurred.  Rather, they disagree with Fuller's interpretation of events, arguing that the IDOC was supportive of Fuller after the rapes.  But, at the summary judgment stage, we ask only whether "a reasonable juror drawing all inferences in favor of [Fuller] could return a

---

[9] As we note in the memorandum disposition discussing Fuller's other claims, the denial of her paid leave request does not itself violate Title VII.  Co-worker ostracism alone is also insufficient to violate the statute.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000).  However, these facts are part of "the totality of the circumstances" that we must consider in evaluating whether a reasonable woman would perceive her workplace environment as hostile.  *See Zetwick*, 850 F.3d at 444.

verdict in [her] favor;" we do not "weigh the evidence" or resolve whether the employer's actions were more supportive than discriminatory. *Zetwick*, 850 F.3d at 441 (internal quotation marks omitted).

The IDOC's actions were less drastic than those of the employer in *Little*, who advised the plaintiff to drop her rape complaint, and when she did not, reduced her pay and fired her. 301 F.3d at 964–65. But, a reasonable juror could nonetheless conclude that the IDOC "effectively condoned" the rapes.[10] *Id.* at 967–68. Fuller was forced to return, before she had recovered from her rapes, to a workplace run by supervisors who showed public support for her rapist, eagerly anticipated his return, and continued to pay him while denying her paid leave. In contrast, the employer in *Brooks* removed the alleged harasser from the workplace "as soon as his misdeeds"—an isolated instance of fondling which the court found not "severe"—were discovered and took no actions which could be perceived as supportive of the harasser or indicative that he might return. 229 F.3d at 921–22, 924, 926. Like the victim in *Little*, Fuller "was victimized by three violent rapes," and a reasonable juror could find that her employer thereafter reacted in ways that "allowed the effects of the rape[s] to permeate [her] work environment and alter it irrevocably." 301 F.3d at 967.

A finder of fact may ultimately conclude, as does our dissenting colleague, that the IDOC acted reasonably when

---

[10] It is not necessary that the IDOC either intended to discriminate or knew that its conduct created a hostile work environment. *Reynaga*, 847 F.3d at 687 (explaining that "hostility need not be directly targeted at the plaintiff to be relevant to his or her hostile work environment claim"); *EEOC v. Nat'l Educ. Ass'n*, 422 F.3d 840, 844–45 (9th Cir. 2005) (concluding that harassers need not intend to discriminate).

confronted with a difficult situation.  Today we conclude only that, viewing the evidence in the light most favorable to Fuller, a reasonable trier of fact could also find that the IDOC's actions were sufficiently severe or pervasive to create a hostile work environment.[11]

## B.  Employer liability.

"An employer may be held liable for creating a hostile work environment either vicariously (i.e., through the acts of a supervisor) or through negligence (i.e., failing to correct or prevent discriminatory conduct by an employee)." *Reynaga*, 847 F.3d at 688.  Fuller argues that the IDOC is vicariously liable for the hostile work environment created by its supervisors' responses to her rapes.  The IDOC does not dispute that Harvey, Atencio, and Reinke were "supervisors."  *See id.* at 689 (defining supervisor as "a person who can take tangible employment actions against an employee").  Nor does the IDOC dispute that the supervisors' actions here were within the scope of their employment.[12]  *See Faragher*, 524 U.S. at 807–08.  Thus, if

---

[11] The dissent claims that we are condemning "the IDOC's refusal to denigrate Cruz merely because he was accused of wrongdoing." Dissent at 46.  Incorrect.  We hold only that a reasonable juror could find that the IDOC's decision to support Cruz, both publically and internally, after Fuller reported that he raped her, contributed to a hostile work environment—whether or not the IDOC reasonably decided not to disclose the sealed protective order or publicize the allegations against Cruz before they were proven.

[12] The IDOC argues that Fuller must demonstrate negligence by the agency, rather than seek to impose vicarious liability for the actions and omissions of its supervisory employees.  But, the cases it cites involve harassment by co-workers or non-employees, not the creation of a hostile work environment by supervisors.  *See Little*, 301 F.3d at 968 (discussing when "employers are liable for harassing conduct by non-employees");

a jury finds that the IDOC supervisors created a hostile work environment, the IDOC would also be liable.

## C.  The Dissent.

The dissent is flawed in two important respects.  First, it ignores that, in reviewing the grant of summary judgment, we must take all the facts and reasonable inferences in favor of Fuller.  Second, in concluding that Fuller did not suffer discrimination "because of sex," the dissent takes an improperly narrow view of the inferences that can reasonably be drawn from the facts actually in the record.

### (1) Improper summary judgment analysis.

The dissent criticizes us for drawing all inferences from the evidence in the light most favorable to Fuller.  Dissent at 25–27.  But, that is precisely our judicial duty at the summary judgment stage.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 252, 255 (1986).

The dissent repeatedly ignores this directive.  For example, it claims to accept Fuller's sworn testimony that Cruz raped her, but then emphasizes that "Cruz has never

---

*Ellison*, 924 F.2d at 881–82 (setting forth liability standard "for sexual harassment by co-workers" and explicitly distinguishing "employer liability for a hostile environment created by a supervisor"); *Brooks*, 229 F.3d at 924 (analyzing whether employer can be liable for "an isolated incident of harassment by a co-worker").  We recently emphasized the distinction between these two forms of liability in *Reynaga*, 847 F.3d at 688–89.

been charged or convicted" of the rapes and highlights that the relationship with Cruz was once consensual. Dissent at 27–28 & n.4. Similarly, the dissent purports that "the IDOC investigated and addressed each of" the prior sexual harassment incidents involving Cruz adequately, when in fact the record evidence on this point is far from undisputed. *Compare* Dissent at 29–30 & n.6 (deeming evidence as "unsubstantiated complaints") *with* Atencio Deposition at 36, Harvey Deposition at 52 (Atencio expressing concern about Cruz's behavior and asking Harvey to "keep an eye on him," but taking no disciplinary action or making "any sort of report" of the allegations), Harvey Deposition at 239 (Harvey testifying that Atencio never directed him to "make any report to HR or [the Office of Professional Standards]" (OPS) about Davila and McCurry's allegations against Cruz and that he was not aware of "any informal or formal discipline that Cruz received as a result of the events"), OPS Supplemental Investigation Report at 2 (Davila and McCurry's supervisor "felt both incidents were inappropriate" and "was not aware of any disciplinary action taken against Cruz for these incidents"). Other improper factual and credibility determinations abound. *See, e.g.*, Dissent at 27–28 & n.3 (acknowledging Cruz "received supportive phone calls . . . even from IDOC supervisors," but concluding that Fuller could not possibly perceive such conversations as evincing support for Cruz because they occurred only "on a couple of occasions"), 32& n.9 (emphasizing that Fuller was forced to return to work only by "her own assessment of her financial situation," but discounting evidence that Fuller felt she was treated poorly as a rape victim), 34 n.13 (dismissing Fuller's belief "that the IDOC had exonerated Cruz" as merely "second-hand gossip"), 34 (highlighting that "Fuller surreptitiously recorded" the meeting with IDOC supervisors).

In concluding that the IDOC's denial of administrative leave could not have contributed to a hostile work environment because it was not itself discriminatory, the dissent ignores undisputed record evidence about what the IDOC actually *told* Fuller—that her situation was not "unusual" enough to warrant paid leave, although her male rapist was entitled to such leave and his colleagues' support. *See* Dissent at 32 n.9, 33 n.12, 35 n.15, 41 n.17.  And indeed, perhaps most tellingly, the dissent brushes over and deemphasizes the critical lines from Harvey's comments about Cruz, both in the initial staff meeting and in the later email to the staff, sent after Fuller reported her rapes.  *See* Dissent at 27 (describing Harvey's comment that the IDOC "looked forward to [Cruz's] coming back very soon" as made "in passing"), 30 (discounting lines "if you want to talk to him, give him some encouragement, etc., *please feel free*" and "[j]ust as a reminder—and *this is always one thing I hate about these things*—he cannot come to the office until the investigation is complete") (emphasis added).  Yet, as the dissent correctly notes, "we cannot ignore undisputed evidence simply because it is unhelpful to" our own view of the merits.  Dissent at 26–27.

At trial, a jury might conclude, as the dissent does, that the IDOC's conduct was "proper."  Dissent at 46.  But, we "must adopt the inference that is most favorable to the non-moving party," rather than "weigh the merit of [competing] inferences."  *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1123–24 (9th Cir. 2009).  That the dissent can point to some irrelevant evidence as "undisputed" does not deem the inference from other evidence that Fuller was discriminated against because of her sex to be not "rational or reasonable."  Dissent at 25–27.

### (2) Incorrect "because of sex" analysis.

The dissent also contends that Fuller presented no evidence that she was discriminated against "because of" her sex. Dissent at 39–46. However, that argument, which the IDOC did not raise, misreads the precedent.

A Title VII plaintiff must prove discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (internal quotation marks omitted). The Supreme Court has emphasized that a plaintiff is not confined to a specific "evidentiary route" to meet this requirement. *Id.* at 81. Although the dissent correctly notes potential evidentiary routes that Fuller *could* have followed to raise a triable issue of fact as to discrimination because of her sex, Dissent at 40, her claim does not fail merely for following a different route than the ones the dissent favors. *See Oncale*, 523 U.S. at 80–81 (explaining that "[w]hatever evidentiary route the plaintiff chooses to follow," they must prove discrimination because of sex); *EEOC v. Nat'l Educ. Ass'n*, 422 F.3d 840, 844–45 (9th Cir. 2005) (finding discrimination "because of . . . sex" where "primarily women were the targets" of employer's conduct).

In *Little*, we held that "[b]eing raped is, at minimum, an act of discrimination based on sex. Thus, the employer's reaction to a single serious episode may form the basis for a hostile work environment claim." 301 F.3d at 967–68 (citation omitted). The dissent correctly notes that the rape in *Little* occurred in the workplace, while the rapes of Fuller did not. Dissent at 41–43. But, *Little* directly responds to the dissent's legal argument that any disparate treatment of

a rape victim who was not assaulted in the workplace cannot be because of sex. *Little* teaches that when an employer acts in a way that "effectively condone[s]" or ratifies a rape or sexual assault and its effects, a jury may reasonably infer that the employer itself is discriminating "because of sex." 301 F.3d at 968.

Indeed, "Little [did] not seek relief based on imputed liability for the rape. Rather, her claim [was] about whether [her employer's] reaction to the rape created a hostile work environment." *Id.* at 966. And, while Little's rape occurred in the workplace, we found "more significant[]" the fact that the employer's "subsequent actions reinforced rather than remediated the harassment." *Id.* at 967. Thus, we held that a question of material fact arose as to whether the employer's actions created a sexually hostile work environment because it "allowed the effects of the rape to permeate Little's work environment and alter it irrevocably." *Id.*

Thus, contrary to the dissent's assertion, *Little* did not confine its holding to an employer's response to rapes that themselves "qualify as workplace conduct." Dissent at 43. Nor would such a holding make sense: if an employer, acting in the workplace, discriminates against a female rape victim in the conditions of her employment by condoning her rape and its effects, that employer should not escape Title VII liability for its discrimination merely because a rapist employee conducted his assault off the premises. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (holding that Title VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment" (internal quotation marks omitted)). Although we decline to opine on whether other circumstances may constitute "condoning or ratifying" a rape, we find that Fuller has raised a question of material fact

as to whether the IDOC did so here. And, contrary to the dissent's assertion, we are aware of no case requiring proof of a tangible adverse employment action—such as silencing an employee's complaint, cutting her pay, or firing her— in a hostile work environment claim, let alone in one based on an employer's reaction to a rape. *Compare* Dissent at 43–44 *with Meritor*, 477 U.S. at 64 (holding that a hostile work environment violates Title VII because "the language of Title VII is not limited to 'economic' or 'tangible' discrimination").[13]

Furthermore, an inference of discrimination because of sex is even more reasonable where, as here, the record also contains evidence of Fuller's *male* supervisors' solicitous treatment of the *man* whom they knew may have raped Fuller and their less solicitous treatment of the *woman* who reported the rape. When "[t]he record reveals at least a debatable question as to the objective differences in treatment of male and female employees, and strongly suggests that differences in subjective effects were very different," summary judgment is inappropriate. *EEOC*, 422 F.3d at 845–46.

To the extent that the dissent argues that the record does not permit the inference that the IDOC's treatment of Fuller would have been any better had Fuller been a man, or that

---

[13] The dissent concedes that an employer's actions undertaken "*because of* a rape (whether in or outside of the workplace) might give rise to a reasonable inference of discrimination because of sex." Dissent at 43–44. We agree. But, an equally reasonable inference of discrimination because of sex surely also arises when an employer, knowing that a female employee was sexually assaulted by a male co-worker, nonetheless tells its employees that it looks forward to the rapist's return to work and encourages them to contact him with messages of support.

any such inference would be based on "overbroad generalizations" based on gender, *see* Dissent at 45 n.20, it ignores reality. We must view the evidence in light of "the different perspectives of men and women." *Ellison*, 924 F.2d at 878. "[W]omen are disproportionately victims of rape and sexual assault," and, accordingly, "women have a stronger incentive to be concerned with sexual behavior. . . . Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive." *Id.* (footnote omitted). Therefore, a jury armed with "[c]ommon sense, and an appropriate sensitivity to social context" could reasonably conclude that the actions of Fuller's supervisor—siding with Cruz, her alleged rapist, over her—were because of her sex. *Oncale*, 523 U.S. at 82. It is up to a jury, not us, to decide whether that plausible inference is the best one to draw from this record.

## CONCLUSION

We vacate the summary judgment in favor of the IDOC and remand for a trial on Fuller's Title VII hostile work environment claim. Costs on appeal are awarded to Plaintiff-Appellant.

---

IKUTA, Circuit Judge, dissenting:

An employer is liable for sexual harassment under Title VII only if it engages in discriminatory conduct that alters the "terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Courts may conclude that abusive conduct is "discriminat[ion] . . . because of . . . sex," *id.*, based on evidence that "members of

one sex [were] exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).  Because there is no evidence in the record that the Idaho Department of Corrections (IDOC) treated any female employee differently because of her sex, it is impossible to point to any such discrimination here. Nevertheless, the majority concludes that the IDOC may have violated Title VII because it abstained from damaging an employee's reputation while an investigation into the employee's alleged misconduct was still pending.   In reaching this conclusion, the majority ignores Supreme Court precedent directly on point and writes "because of . . . sex" out of the statute. *See id*. at 80–81.  I dissent.[1]

## I

The threshold flaw in the majority's analysis is its misapprehension of the summary judgment standard.

## A

A party seeking summary judgment must demonstrate that "there is no genuine dispute as to any material fact" and that the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law," and a genuine dispute is one for which "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

---

[1] I concur in the concurrently filed memorandum disposition that affirms the district court's entry of summary judgment in the IDOC's favor on the remaining claims. *See Fuller v. Idaho Dep't of Corr.*, — F. App'x — (9th Cir. 2017).

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We draw inferences "in the light most favorable to the nonmoving party," but only if the inferences are rational or reasonable. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," even if the jury credited the nonmoving party's evidence and drew all reasonable inferences in the nonmoving party's favor, then "there is no genuine issue for trial" and the moving party is entitled to summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

Taking this record as a whole and drawing all reasonable inferences in favor of Fuller, no reasonable jury could conclude that the IDOC engaged in "discriminat[ion] . . . because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), a necessary element of Fuller's Title VII claim. Because no reasonable jury could return a verdict in Fuller's favor, the IDOC is entitled to judgment as a matter of law. Rather than consider the record as a whole, however, the majority focuses only on those circumstances favoring Fuller.**[2]** This is a misapprehension of the summary judgment standard; we must credit Fuller's evidence where a conflict exists (there are no such conflicts in this case), and we must draw all reasonable inferences in her favor, but we cannot ignore undisputed evidence simply because it is unhelpful to her

---

**[2]** Indeed, the majority seems to think that it is an error to acknowledge undisputed facts that are not helpful to Fuller. *See, e.g.*, Maj. op. at 18–19 (criticizing the dissent for noting, among other undisputed facts, that Cruz has not been charged or convicted of rape, that Fuller had been in a consensual relationship with Cruz, and that Fuller had surreptitiously recorded the meeting with IDOC supervisors).

case or make inferences that are unreasonable.  Because the majority fails to recite all the relevant, undisputed facts (and therefore mistakes unreasonable inferences for reasonable ones), I provide them here.

B

Fuller and Herbt Cruz first met while coworkers at the IDOC.  A few months after their first meeting, they embarked on a voluntary romantic relationship.  By all accounts, their relationship was ordinary and functional from its genesis through the late summer of 2011.  But events in August and September of that year tore the relationship apart and set this lawsuit into motion.

The key facts for this story begin, in large part, on August 15, 2011.  That was the day the IDOC placed Cruz on paid administrative leave after learning that the Canyon County Sheriff's Office was investigating allegations that he raped a woman identified as "J.W."  That same day, IDOC supervisor Kim Harvey announced at a staff meeting that Cruz was on administrative leave due to an investigation.  He also said, in passing, that he hoped things would be cleared up so that Cruz could return to work.  Fuller, who was still in a romantic relationship with Cruz at the time, was in attendance at that staff meeting.  She was unaware, however, of the nature of the allegations against Cruz.

While Cruz was on administrative leave, he received supportive phone calls from his friends, coworkers, and even from IDOC supervisors.  Fuller was aware of these contacts; she and Cruz were still dating, so she would overhear Cruz on the phone, or Cruz would simply tell her about the calls.  She also knew that Cruz "had various friends that worked for the department" who were reaching out to him.  As for the

IDOC supervisors, all Fuller ever knew was that Cruz spoke with them "on a couple of occasions."[3]

It was not until late August and early September that Fuller and Cruz's relationship turned sour. In the span of those few weeks, Fuller alleges that Cruz raped her on three different occasions.[4] Each incident occurred while the two were away from work and on their own private time.

So how did this become a workplace harassment issue? The IDOC learned of the alleged rapes in early September 2011 when Fuller's friend, Renee Bevry, showed Harvey photographs of Fuller's bruises and said "you need to be aware of this." Harvey immediately notified the IDOC's professional standards office and local law enforcement of this further allegation that Cruz had engaged in serious misconduct, and he then met with Fuller to find out what happened and to encourage her to report her allegations to the sheriff. When Fuller agreed, Harvey accompanied her to an interview with law enforcement to report her accusations, and he took her to lunch the day she reported. At that lunch, Harvey mentioned that there had been prior accusations of misconduct against Cruz, but did not provide any further information. Afterwards, Harvey escorted Fuller home and searched her house before she entered to make sure no one was inside. Once Fuller had collected some personal items,

---

[3] Although the majority states that Fuller was aware that IDOC supervisors were "offering [Cruz] support during his suspension," Maj. op. at 13, there is nothing to this effect in the record.

[4] For purposes of summary judgment, we assume the truth of this allegation, which the IDOC neither denies nor concedes. It is undisputed that Cruz has never been charged or convicted of any misconduct with Fuller or J.W.

he then took her to Bevry's home, where she felt safer staying.

As Harvey correctly indicated to Fuller, Cruz had been on the receiving end of complaints more than once before.[5] The record shows that the IDOC investigated and addressed each of these complaints. In early 2003, Sandra Martin, an IDOC employee, alleged that Cruz had shown romantic interest in her by abandoning his post to follow her into the recreation yard where she was monitoring inmates. Martin also accused Cruz of taking her car keys. Martin made clear to the IDOC that she perceived this as sexual behavior, and the IDOC investigated the allegations and met with all concerned parties. Martin eventually sued the IDOC in 2006, alleging sexual harassment by Cruz and another male employee, but the lawsuit was resolved by final judgment in the IDOC's favor. *See Martin v. Idaho Dep't of Corr.*, No. 06-cv-55, 2007 WL 1667597 (D. Idaho June 7, 2007). In 2010, Letticia Davila, an IDOC employee, expressed concern about reports that Cruz might be transferred to her office. Her concern arose from a long ago training session in which Cruz portrayed an offender attempting to take over Davila's office by force. Davila stated that Cruz took "his role-playing too seriously," and blocked her office door when she tried to leave; he moved out of the way, however, when she threatened to knee him. Davila stated she did not perceive Cruz's conduct as sexual. She also told the IDOC that in 2008, Cruz had behaved inappropriately with one of her coworkers by putting a hand on the woman's knee. When interviewed by the IDOC, the coworker stated that, in her view, no sexual harassment had occurred and that her

---

[5] Fuller admits that she never witnessed Cruz sexually harass a female employee at the IDOC.

interaction with Cruz was "not a big deal." Because the investigation disclosed no misconduct, the IDOC did not discipline Cruz.**[6]** However, the IDOC decided not to transfer Cruz to the office where Davila worked, and Harvey told his staff to "watch [Cruz] and see if there's any further incidents that you think are inappropriate."

The day after Fuller reported her allegations to the police, she obtained the first of several confidential civil protection orders prohibiting Cruz from being within 1,000 feet of Fuller or her workplace. That same day, Harvey sent an email to IDOC staff in which he informed all staff members that Cruz "cannot come to the office until the investigation is complete and cannot "talk to anyone in the Department about the investigation," although the staff was free to talk to him and "give him some encouragement."**[7]**

---

**[6]** The majority conflates a failure to discipline with a failure to investigate, Maj. op. at 19, and argues that the complaints against Cruz are probative of a general disrespect for woman at the IDOC, *id.* at 13 n.8. This misrepresents our precedent; although actual sexual harassment of others can be probative of attitudes toward women, unsubstantiated complaints are not. *Compare id.* (focusing on "knowledge of previous sexual harassment complaints"), *with Zetwick v. County of Yolo*, 850 F.3d 436, 445 (9th Cir. 2017) (focusing on "[t]he sexual harassment of others" that has been "shown to have occurred").

**[7]** The email stated in full:

> Just an update on Cruz. I talked to him. He sounds rather down, as to be expected. Said he is trying to stay busy. Just as a reminder—and this is always one thing I hate about these things—he cannot come to the office until the investigation is complete. Nor can he talk to anyone in the Department about the investigation. So, if you want to talk to him, give him some encouragement etc., please feel free. Just don't

Around this same period, Fuller took some time away from work. She did not need to request this time off, because the IDOC told her that she "could take as much time as [she] needed." In addition, Harvey told Fuller that he would investigate whether Fuller qualified for pay during her leave. In mid-September, IDOC Deputy Chief Henry Atencio informed Fuller via email that the IDOC would not offer Fuller paid administrative leave, based on the IDOC's longstanding practice to extend paid leave only "when there is departmental action against the employee, such as an investigation." In that same email, Atencio told Fuller that she was free to use her sick leave and vacation balances. After Atencio denied Fuller's request for paid administrative leave, she applied for leave under the Family and Medical Leave Act, and the IDOC promptly approved that request.

While Fuller was on leave, her supervisors at the IDOC were working towards ways to accommodate her situation. For example, on September 15—the day Fuller had to appear in court to renew her confidential civil protection order—Harvey called to check in with her. During that call, Harvey told Fuller "that if she is not comfortable with coming back to work" at her division, Harvey "would do what [he] could to help her transfer." Later in that month, Harvey continued to try to check in with Fuller, but to no avail. He "attempted to contact her by phone, leaving messages that [were] not returned," and he "even went by her house[,] . . . but she was not there." Atencio and the other supervisors were aware of

talk about the investigation. At this point, I honestly don't know the status of it.

Harvey's efforts, which he communicated to them via email.**[8]**

In late October, Fuller emailed Atencio to inform him of her reluctant decision to return to work. In her email, she stated it was a "sad day" that Cruz "gets to sit at home and collect a check at the tax payers expense" while she was denied paid administrative leave. Although she was "appalled by the way this situation has been handled," she stated that she had "exhausted all leave and am now forced to return to work against my Doctor, Counselor, and Attorney's recommendation."**[9]** Because Fuller's doctor certified that Fuller was "unable to concentrate and perform," suffered from "severe anxiety," and was "unsafe to carry [a] weapon," the IDOC placed her on modified duty. Upon her return, Fuller found the IDOC to be a "completely uncomfortable work environment," in which her coworkers ostracized her because they believed she had been "faking" a medical issue. But the coworkers knew nothing about her alleged rapes. Indeed, no one made any comments about the rapes (or sexually suggestive comments more generally),

---

**[8]** Fuller faults the IDOC because "Atencio did not ask Harvey to check on Fuller while on leave, in direct contrast to directing him to regularly check on Cruz." This attempt to impute discriminatory animus falls flat in light of Atencio's knowledge that Harvey was checking on Fuller of his own volition.

**[9]** Although Fuller's email expresses her frustration over the denial of paid administrative leave, which the majority agrees was not unlawful, the email cannot reasonably be interpreted to mean that Fuller was forced to return to work by anything but her own assessment of her financial situation, i.e., she could not afford *not* to return. *Contra* Maj. op. at 15 (claiming that Fuller has "evidence" that she was "forced to return to work"). There is no evidence in the record that the IDOC ever instructed or required Fuller to return to work.

and no one suggested that Fuller had done anything inappropriate.

On November 6, a little over two weeks after her return, Fuller submitted a letter to Atencio outlining why she believed that the IDOC should reverse course and grant her paid administrative leave. She identified eight reasons: (1) she had incurred significant expenses in retaining an attorney to obtain her confidential civil protection orders; (2) it was "unbecoming" that Cruz, who was suspended pending a disciplinary investigation, receive paid leave but not her; (3) the IDOC was paying Cruz even though policy provided for unpaid suspension when an employee was indicted on felony charges;[10] (4) Cruz was being extended a "courtesy"; (5) the IDOC failed in its obligation to provide Fuller with information about filing a harassment complaint;[11] (6) Cruz was a threat to safety; (7) paid administrative leave was discretionary;[12] and (8) "the department conducted an investigation which found Mr.

---

[10] As noted previously, it is undisputed that Cruz has never been criminally charged in relation to J.W.'s or Fuller's allegations, so this ground was premised on a misapprehension of fact. *See* supra, note 4.

[11] As we hold today, no underlying workplace sexual harassment occurred because Fuller's rapes were not related to the workplace. *See Fuller*, — F. App'x at —; Maj. op. at 12 n.7. It follows that the IDOC had no such obligation.

[12] We hold today that Fuller has no evidence that the IDOC's denial of her paid leave request was anything other than the lawful application of a neutral policy. *See Fuller*, — F. App'x at —; Maj. op. at 15 n.9.

Cruz innocent of a crime."[13]  This letter prompted a meeting between Fuller and IDOC officials on November 10.

At the November 10 meeting, which Fuller surreptitiously recorded, Atencio explained the IDOC's neutral policy for extending paid administrative leave only to employees (like Cruz) who were under investigation. Fuller argued that the Standard Operating Procedure "clearly states" that the IDOC could award paid leave "under unusual circumstances."[14]  Atencio acknowledged that the manual

---

[13] Fuller believed that the IDOC had exonerated Cruz based on a statement by the county sheriff, who in turn had allegedly heard the information from an unnamed source.  Or, put more simply, this was second-hand gossip.  There is no evidence that an IDOC official ever made any representation to Fuller that Cruz had been, or would be, exonerated.

[14] The IDOC's Standard Operating Procedure Manual provided:

> **5. Paid Administrative Leave**
>
> The director of the IDOC, in consultation with the director of HRS and the applicable division chief, may grant paid administrative leave under the following conditions:
>
> • When the employee is being investigated;
>
> • When the employee is in the due process procedure of a disciplinary action;
>
> • When the governor, manager, or designees declare an IDOC facility closed or inaccessible because of severe weather, civil disturbances, loss of utilities, or other disruptions;
>
> • When a manager (or designee) deems it necessary due to an unusual situation, emergency, or critical

contained such language, but stated that "in discussing this with the leadership, and with HR, we don't think that the situation rises to that point where it's unusual, and would warrant leave with pay."**15**

Later in the meeting, Fuller requested that her IDOC coworkers be informed of her confidential civil protection order against Cruz. Atencio responded that, although he knew that Fuller would find it "distasteful," the IDOC could not comply with that request because "Cruz is still our employee and we have to be cautious of his rights." But Atencio proposed a compromise: If the legal team verified that it was lawful to do so, the IDOC would send a reminder email to employees that Cruz was under investigation and not allowed at IDOC premises and that employees should contact a supervisor immediately if Cruz comes to the IDOC workplace. Atencio also informed Fuller that the IDOC would work with her to arrange for days when Fuller could

---

> incident that could jeopardize IDOC operations, the safety of others, or could create a liability situation for the IDOC; or
>
> • When approved in advance by the governor (or designee).

**15** The majority holds that Atencio's statement contributed to a hostile work environment because he "actually *told* Fuller" that "her situation was not 'unusual' enough to warrant paid leave, although her male rapist was entitled to such leave and his colleagues' support." Maj. op. at 20 (emphasis in original). As the majority acknowledges, there is no evidence that the IDOC's limitation on paid administrative leave was anything other than a policy neutrally applied to all staff. *See* Maj. op. at 15 n.9 (noting our unanimous holding that the denial of paid administrative leave did not violate Title VII). Verbalizing the neutral policy does not show discrimination on the basis of sex.

take leave with pay to attend court hearings "and have time afterwards to recover."

As had been proposed at the November 10 meeting, Harvey sent an email on November 16 reminding employees that Cruz "is on leave pending an investigation" and "not allowed in the [IDOC] offices." Employees were further instructed to "contact a supervisor" if Cruz was seen on premises. The supervisors were aware of Fuller's civil protection order, Fuller knew they were aware of the order, and the supervisors knew to contact police if Cruz came to the IDOC's premises. Fuller later explained that if the IDOC had sent an email notifying the staff that there was a civil protection order against Cruz, she "never would have resigned."

At the time Fuller resigned on November 16, IDOC supervisors were in the process of terminating Cruz's employment. By November 8, three supervisory IDOC officials had concluded that Cruz was responsible for multiple misconduct violations, including ones relating to Fuller's allegations. In late December, Cruz was formally notified that the IDOC was contemplating his termination, and he resigned on January 9, 2012.

II

The question in this case is whether these circumstances are sufficient, as a matter of law, to create a sexually hostile work environment. In holding that they are, the majority has lost sight of the key elements of Title VII liability, and effectively holds that an employer can be found liable even in the absence of evidence that any workplace conduct is "discriminat[ion] . . . because of . . . sex." 42 U.S.C. § 2000e-2(a)(1).

A

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." *Id*.[16]  This prohibition does not expressly ban "sexual harassment," but the Supreme Court has held that discriminatory conduct includes sexual harassment, *Meritor*, 477 U.S. at 64 (1986), and that such conduct can alter the terms and conditions of employment if it is "sufficiently severe or pervasive" that it creates "an abusive working environment," *Harris*, 510 U.S. at 21.  But as the statutory language makes clear, the key elements of a Title VII sexual harassment claim are (1) that the employer has engaged in discriminatory conduct (2) that affected the "terms, conditions, or privileges of employment" (3) because of such individual's sex.  42 U.S.C. § 2000e-2(a)(1).

In concluding that sexual harassment is discriminatory conduct, the Supreme Court looked to the EEOC Guidelines, which define sexual harassment to include both

---

[16] This provision provides in full:

(a) Employer practices

It shall be an unlawful employment practice for an employer–

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

"[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature," as well as claims that are not quid pro quo, namely "so-called 'hostile environment' . . . harassment." *Meritor*, 477 U.S. at 65. This can include "discriminatory intimidation, ridicule, and insult," *Harris*, 510 U.S. at 21, such as the use of "sex-specific and derogatory terms," *Oncale*, 523 U.S. at 80.

In order to affect the terms or conditions of employment, the discriminatory conduct must be unwelcome and either severe or pervasive. *See Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998) (per curiam). "[T]he work environment must both subjectively and objectively be perceived as abusive." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)). In making this determination, "we look 'at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (per curiam)). We undertake this analysis from the perspective of "a reasonable woman." *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991).

When engaging in a hostile work environment analysis, however, we must remember the Supreme Court's repeated admonishment that "Title VII does not prohibit all verbal or physical harassment in the workplace." *Oncale*, 523 U.S. at 80; *see also Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2455 (2013) ("Title VII imposes no 'general civility code.'"); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (similar). Rather, a plaintiff must always prove that complained-of conduct occurred because of the individual's

sex.  *Oncale*, 523 U.S. at 80.  There are multiple evidentiary routes a plaintiff can follow to establish this critical element. "Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex."  *Id.* Alternatively, where an employer treats men and women unequally, a trier of fact may infer that the differential conduct is because of sex.  *Id.* at 80–81 ("A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."). Drawing on *Oncale*, we have held that where the conduct at issue "is not facially sex- or gender-specific," we may consider "differences in subjective effects" on women, "along with . . . evidence of differences in objective quality and quantity," in "determining whether or not men and women were treated differently."  *EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 845–46 (9th Cir. 2005). Nevertheless, the "main factual question" is whether the alleged perpetrator's "treatment of women differed sufficiently in quality and quantity from his treatment of men to support a claim of sex-based discrimination."  *Id.* at 844. "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'"  *Oncale*, 523 U.S. at 81.

## B

Contrary to the majority, I would hold that Fuller has not raised a genuine issue of material fact regarding any of the

three elements of a Title VII claim. There is no triable issue that the IDOC engaged in unwelcome harassing conduct of any sort, nor that the IDOC's conduct created a working environment so abusive that it altered the terms and conditions of Fuller's employment. *Cf. Gregory*, 153 F.3d at 1074. But even if there were a triable issue on these two elements, Fuller's action would fail because there is not a shred of evidence to show that any conduct in the workplace was "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The majority has no answer to this dispositive flaw, which is fatal to Fuller's case.

Although a plaintiff may use many evidentiary routes to raise an inference of discrimination because of sex, *see Oncale*, 523 U.S. at 80, Fuller has no viable route to follow. A court may infer discrimination because of sex when the conduct at issue is sexual in nature, but it is undisputed that Fuller experienced no "[u]nwelcome sexual advances" or "requests for sexual favors" at the IDOC. 29 C.F.R. § 1604.11(a). Nor did Fuller present any evidence of "verbal or physical conduct of a sexual nature" in the workplace. *Id.* There is no evidence that anyone at the IDOC was "motivated by general hostility to the presence of women in the workplace," nor is there "direct comparative evidence" that Fuller was treated differently from any similarly situated male. *Oncale*, 523 U.S. at 80–81. The record is entirely devoid of evidence that the IDOC engaged in differential treatment of Fuller because she is a woman. Because Fuller has failed to raise a genuine issue whether the conduct she deemed to be abusive was "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), her claim fails.

Having properly rejected Fuller's claim that the rapes were part of the hostile work environment, Maj. op. at 12 n.7, the majority relies primarily on three incidents:

(1) Harvey's statement at a staff meeting that he hoped Cruz could return, and his later email telling employees that they were allowed to speak to Cruz, *id*. at 12–13; (2) Harvey's comment that Cruz had previously been accused of sexual harassment, *id.* at 12–12; and (3) Atencio's refusal to disclose Fuller's confidential civil protection order in favor of sending a more general email that Cruz was not allowed at the IDOC pending the completion of his investigation, *id.* at 13. While Fuller found this conduct offensive, there is no evidence in the record to support a claim that the IDOC took these measures because Fuller is a woman.[17]

The majority rests its holding on *Little v. Windermere Relocation, Inc.*, *see* Maj. op. at 12, but this case provides no support. The plaintiff in *Little* worked in business development to cultivate corporate clients. 301 F.3d at 964. As part of the plaintiff's job, the president of her company directed her to "do whatever it takes" to obtain a Starbucks account for the firm. *Id.* To that end, the plaintiff met with a Starbucks officer on several occasions, including once over dinner and drinks. *Id.* After dinner, the plaintiff passed out

---

[17] The other circumstances cited by the majority likewise do not support any inference of "discriminat[ion] . . . because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). For instance, the majority cites the phone calls to Cruz from IDOC supervisors, Maj. op. at 13, but those were neither improper nor discriminatory. In fact, Fuller does not dispute that IDOC supervisors checked in on Fuller during her leave as well. Equally non-discriminatory was the denial of paid administrative leave, Maj. op. at 15, which we unanimously conclude was not an employment action taken on account of sex, *id.* at 15 n.9. The same is true of Fuller's ostracization by co-workers, *id.* at 15, which not even Fuller has suggested was because of sex. And finally, the majority's statement that Fuller was "forced" to return to work, *id.* at 15, fails in light of the fact that Fuller undisputedly returned to work because she could not afford to take any more leave, not because the IDOC required her to return, *see* supra, note 9.

and was raped multiple times by the Starbucks officer. *Id.* When the employee reported the rape to the employer, the company president expressed his displeasure with her report, reduced her salary, and ultimately "told her it would be best if she moved on and that she should clean out her desk." *Id.* at 965. We held that the rape was part of the employee's work environment because "[h]aving out-of-office meetings with potential clients was a required part of the job" and "[t]he rape occurred at a business meeting with a business client." *Id.* at 967. As such, we concluded that the employee had raised triable issues as to all three elements of a Title VII hostile work environment claim. The rape was "unquestionably among the most severe forms of sexual harassment"; "[b]eing raped by a business associate, while on the job, irrevocably alters the conditions of the victim's work environment"; and "[b]eing raped is, at minimum, an act of discrimination based on sex." *Id.* at 967, 968.

*Little* distinguished a prior opinion holding that "a 'single incident' of harassment" (in that case, an employee's forcing "his hand underneath [a female employee's] sweater and bra to fondle her bare breast," *Brooks v. City of San Mateo*, 229 F.3d 917, 921 (9th Cir. 2000)), which was "followed by immediate corrective action by the employer," did not create a hostile work environment because it "was not sufficiently 'severe or pervasive.'" *Little*, 301 F.3d at 967 (citing *Brooks*, 229 F.3d at 925–26). *Little* reasoned that *Brooks* did not control because in that case, "the harassing employee was fired," but in *Little*, "not only was there no remediation, the harassment was arguably reinforced by [the victim's] employer." *Id.* In other words, the foundation for Title VII liability in *Little* was the failure to remedy a serious incident of workplace sexual harassment, coupled with the employer's further abusive treatment of the victim by, for

example, cutting her pay, which "reinforced rather than remediated the harassment." *Id.*

By contrast to *Little*, Fuller's rapes were unrelated to her "employment." *See Fuller*, — F. App'x at —; Maj. op. at 12 n.7. Accordingly, Fuller cannot rely on the rapes as evidence that she suffered a severe form of sexual harassment on the job, which altered the terms and conditions of her work environment and constituted discrimination on the basis of sex. *Little* neither requires the IDOC to remedy harassment that occurs outside the context of work, nor holds that inadequate remediation of such harassment evinces discrimination because of sex. Thus, as the IDOC correctly argues, if the rapes do not qualify as workplace conduct, then there was no sexual harassment in the workplace. Because no other evidence suggests hostility towards women or disparate treatment of women, it follows that Fuller was not harassed "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1).

The majority contends that an employer's discrimination against a female employee because the female employee had been raped could constitute discrimination based on sex, whether the rape occurred at the workplace or outside the workplace. Maj. op. at 22. Although *Little* does not directly support such a rule,[18] harassing conduct undertaken against a female employee *because of* a rape (whether in or outside of the workplace) might give rise to a reasonable inference of discrimination because of sex and therefore support a

---

[18] Because *Little* relied on both (1) the plaintiff's rape "by a business associate, while on the job" (which *Little* identified as among the most severe forms of discrimination based on sex), and (2) the employer's response to the rape, the rule we announced in *Little* is not directly applicable to situations like Fuller's. 301 F.3d at 967–68.

Title VII claim.  The majority also argues that when an employer "effectively condone[s] or ratifies a rape or sexual assault and its effects," the employer may be deemed to be discriminating against the raped or assaulted employee "because of sex."  Maj. op. at 22 (internal quotation marks omitted).  The majority declines to explain what constitutes condoning or ratifying a rape, *id*. at 22–23, but in *Little* we held that an employer condoned a workplace rape by attempting to silence the employee's complaint, cutting her pay, and ultimately firing her.  301 F.3d at 965.  One can imagine circumstances where such a response to a non-workplace rape or assault could constitute discriminatory conduct based on sex that is so severe and pervasive as to affect the terms of employment.

Fuller, however, has not created a genuine issue for trial that any conduct—discrimination against an employee because the employee was raped, or conduct condoning or ratifying a rape—occurred here.  By contrast to *Little*, the IDOC never attempted to silence Fuller's complaint, cut her pay, or fire her.  Rather, the record here indisputably shows that the IDOC took immediate remedial steps in response to Fuller's complaints, even though her complaints were not based on workplace conduct.  When Fuller reported her allegations to the IDOC, Cruz was already separated from the workplace, the IDOC warned employees that he could *not* be on premises, and at no point did anyone with the authority to speak on the IDOC's behalf tell Fuller (or any IDOC employee) that Cruz had been exonerated or would return.  Instead, the IDOC diligently investigated Fuller's allegations, believed them, and ultimately used them as the basis of the decision to terminate Cruz's employment.  *Cf. Brooks*, 229 F.3d at 922 (noting the employer's "prompt remedial action" in investigating an incident and initiating termination proceedings against a misbehaving employee,

who ultimately resigned).[19]   Even under the majority's expansive reading of *Little*, no reasonable jury would equate an employer's decision to terminate an employee accused of harassment with condoning the employee's behavior.

In the absence of any evidence of "discriminat[ion] . . . because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), the majority points out that Fuller is a woman, but some of her IDOC supervisors were men. Maj. op. at 23. But we long ago held that the mere fact that a plaintiff is a different sex from her alleged harassers "is not sufficient to raise a jury question." *Gregory*, 153 F.3d at 1075. This might be different if there were "a debatable question as to the objective differences in treatment of male and female employees" at the hands of the supervisors. *NEA*, 422 F.3d at 846. But on this record there is no evidence that Fuller was treated differently from any male employee, and so no inference of discrimination arises.[20]  *Id.; see also Oncale*, 523 U.S. at 80.

---

[19] The majority's argument that *Brooks* is distinguishable because the employer in *Brooks* "took no actions which could be perceived as supportive of the harasser or indicative that he might return," Maj. op. at 16, finds no basis in the *Brooks* opinion. *Brooks* never mentions one way or the other what the employer did beyond investigating the incident and pursuing disciplinary action.

[20] The majority also notes that despite the lack of any evidence in the record that would allow a reasonable jury to conclude that Fuller was treated differently because of sex, we should nevertheless conclude there is a triable issue because women are "disproportionately victims" who have "different perspectives" from men. Maj. op. at 24. This suggests that, were Fuller a man, the majority may have entertained a different outcome, given the "different perspectives" men might have about sex. *Id*. In many areas of the law, "[o]verbroad generalizations of that order" are inappropriate—indeed, constitutionally suspect. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1692, 1693 n.13 (2017).

The conduct that the majority deems to be abusive—the IDOC's refusal to denigrate Cruz merely because he was accused of wrongdoing—was proper and perhaps legally necessary. Public employees can have a constitutionally protected property interest in their employment, and they are entitled to fair procedures before that interest is terminated. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985). Similarly, public employees have a protected liberty interest at stake; a public employee may sue an employer where contested, stigmatizing information about the employee is publicly disclosed in connection with the employee's termination. *E.g.*, *Guzman v. Shewry*, 552 F.3d 941, 955 (9th Cir. 2009). The IDOC had an obligation of constitutional magnitude to tread carefully with its disclosure of any stigmatizing charges against Cruz until Cruz had been afforded an appropriate opportunity to clear his name. These concerns made it reasonable for the IDOC to decline to reveal any information about the charges against Cruz until those charges had been substantiated, and to decline to disclose Fuller's confidential civil protection order against Cruz in favor of an email that alerted employees that Cruz was not allowed on IDOC premises in a more neutral manner. I would hold that the IDOC's decision to avoid prematurely injuring Cruz's reputation was not discriminatory conduct that is objectively abusive. But in any event, the IDOC's treatment of Cruz cannot support an inference of discrimination because of sex.

## III

Even if the IDOC's actions upset Fuller, subjective perception of abuse is not enough to prevail on a Title VII claim; the abuse must be "discriminat[ion] . . . because of . . . sex." 42 U.S.C. § 2000e-2(a)(1); *Oncale*, 523 U.S. at 80. On this record, there is no evidence of workplace sexual

abuse, *cf. Little*, 301 F.3d at 968, no evidence of supervisors' addressing Fuller in any manner evincing hostility or sexual desire, *cf. Oncale*, 523 U.S. at 80, and no evidence that "members of one sex [were] exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed," *id.* The IDOC did not give Fuller everything she wanted, but it applied facially neutral policies in denying some of her requests, and therefore did not discriminate against her because she is a woman. Rather, the only conclusion supported by this record is that the IDOC accommodated Fuller's situation while respecting Cruz's rights. In other words, this is the story of an employer that worked hard to do the right thing by effectively removing a potential threat from the workplace immediately and permanently, without smearing any employee's reputation before an investigation had been completed. That it may nevertheless find itself liable is a testament not to its missteps, but to our failure to heed *Oncale*'s central lesson.

Because there was no "discriminat[ion] . . . because of . . . sex" on this record, Title VII's text and our precedents compel the conclusion that Fuller's claim fails. 42 U.S.C. § 2000e-2(a)(1). I would therefore affirm the IDOC's judgment in full, and I dissent from the majority's contrary disposition.